955 So.2d 90 (2007)
STATE of Louisiana
v.
Daniel Joseph BLANK.
No. 2004-KA-0204.
Supreme Court of Louisiana.
April 11, 2007.
Rehearing Denied June 1, 2007.
*97 Capital Appeals Project. Jelpi P. Picou, Jr., G. Benjamin Cohen, Aneel L. Chablani, R. Neal Walker, for Appellant.
Charles C. Foti, Jr., Attorney General, Anthony G. Falterman, District Attorney, Donald D. Candell, Charles S. Long, Assistant District Attorneys, for appellee.
VICTORY, J.
This is a direct appeal under Louisiana Constitution article V, § 5(D) by the defendant, Daniel Blank. On December 11, 1997, an Ascension Parish grand jury indicted defendant for first-degree murder in violation of La. R.S. 14:30. On August 14, 1998, the state filed its notice of intent to seek the death penalty. On December 16, 1998, the district court granted a defense motion for a change of venue and moved the trial to Terrebonne Parish. After a trial by jury, defendant was found guilty as charged on September 2, 1999. At the conclusion of the penalty phase of the trial, the jury unanimously returned a verdict of death, finding the aggravating circumstances that defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary and that the victim was aged 65 years or older. The trial court sentenced defendant to death in accordance with that recommendation. Defendant now appeals his conviction and sentence, raising 72 assignments of error. After a thorough review of the law and the evidence, we find no merit in any of the assignments of error urged by defendant. Therefore, we affirm his conviction and sentence.

FACTS
On the morning of April 10, 1997, Viola Breaux Philippe was waiting for her sister-in-law, 71-year-old Lillian Philippe, to pick her up at home and drive the two women to catch a bus to a religious retreat in Chatawa, Mississippi. When Lillian had not arrived by 8 a.m. and could not be reached by telephone, Viola called her brother-in-law, Dr. Doyle Philippe, and requested that he check on her.
Dr. Philippe arrived at the victim's house at approximately 8:30 a.m. and found her vehicle in the driveway, the door to the house unlocked, and the alarm system *98 deactivated. Finding the circumstances suspicious, Dr. Philippe walked into the hallway, and after briefly surveying the immediate area, went back outside and called the authorities. Gonzales police officer Dowell Brenn arrived at the scene, and Dr. Phillipe accompanied him into the house where they found the victim on the floor at the foot of her bed, covered in blood. Brenn also observed a broken trophy near the victim's head and a bloody "butcher-type" knife next to the bed.
Officer Brenn exited the house, called for back-up, and secured the crime scene. A visual survey of the outside of the residence revealed a hole on the rooftop where an attic vent had been removed. Brenn also saw that a wrought iron chair had been placed atop an air-conditioning unit on the front porch of the residence, presumably to facilitate access to the roof.
Detective Mike Toney was among the officers who participated in the investigation of the Philippe homicide and testified that the victim's family members and friends were ruled out as viable suspects. In the meantime, officials from the Sheriffs' Offices of Ascension, St. John the Baptist, and St. James Parish joined forces with officers from the Gonzales Police Department and agents from the New Orleans Office of the FBI and formed a task force to investigate the murder as among a series of homicides that occurred during home invasions in the river parishes that they believed were related.[1] Defendant, Daniel Blank, became implicated as a possible perpetrator of the crimes after an aggravated burglary that occurred at the residence of Leonce and Joyce Millet on July 6, 1997. Following that incident, a composite sketch of the suspect was composed pursuant to the Millets' recollection of the suspect and released to the media. Both an anonymous informant and Elton Cloutare, a security guard at the Square Deal Casino in Sorrento, Louisiana, identified defendant as resembling the individual depicted in the sketch.[2]
On September 25, 1997, Detective Toney proceeded to defendant's last known address in Sorrento, where he encountered Dorothy Recher, the mother of defendant's girlfriend, Cynthia Bellard. Recher told the officer that defendant did not live there anymore but indicated that she would try to get a message to him. Defendant called the detective at his office approximately 15 minutes later and the officer advised defendant that he wanted to question him concerning some murders that had occurred in Ascension Parish. Toney explained that defendant's name had come up as a result of an observed change in his spending habits at the casino. Defendant agreed to come and meet with the officer the following weekend and to bring with him proof of his gambling winnings.
Defendant apparently returned to Louisiana from his new home in Texas and left documentation concerning his winnings at the casino with Ms. Recher. Detective Toney collected the documents and conducted a background check on defendant to determine whether his income could support his gaming activity at various area casinos. Subpoenas issued to local gambling *99 establishments revealed that defendant had run a total of $269,000 at three casinos, cashing out a total of $220,216, resulting in a net loss of approximately $49,000. Managers at the Treasure Chest Casino indicated that based on defendant's wagering history, he had a player profile of a corporate executive with annual earnings of over $200,000. In contrast, Louisiana Department of Labor records revealed that defendant had no reported earnings for 1997 and annual earnings of only $13,767 in 1996 and $5,410 in 1995. Department of Motor Vehicles records demonstrated that defendant and Bellard had purchased a pick-up truck, a station wagon, a motorcycle and a utility trailer in 1997. The task force also learned that on July 15, 1997, defendant had purchased a mobile home for $22,000 in Onalaska, Texas. Defendant became the prime suspect in the multiple murders as a result of his unusual spending habits after the commission of the crimes, as well as his past association with three of the victims.
In a subsequent telephone conversation with Detective Toney, defendant agreed to travel to Louisiana to meet with the officer on November 10, 1997, but ultimately did not show up as promised. Consequently, Toney, accompanied by other members of the task force, including Officer Brenn, Lieutenant Benny DeLaune, Detective Todd Hymel, and FBI Agent David Sparks, proceeded to Onalaska to interview him, armed with search warrants for his home and business.
The task force encountered defendant on November 13, 1997, when they arrived at his place of business, Daniel's Automotive, and he readily agreed to accompany the officers to the Onalaska Courthouse Annex. For the next 12 hours, Detective Toney and other members of the task force questioned defendant, first about his spending habits, and later about his participation in the various murders.
After three hours of initial questioning by Detectives Hymel and Toney, during which defendant denied any involvement in the murders, defendant agreed to submit to a polygraph examination. At that time, FBI Agent Sparks proceeded to interview defendant for approximately two-and-one-half hours and conducted the polygraph examination, which related only to the murder of Joan Brock on May 14, 1997, in St. John the Baptist Parish. During this interview, defendant continued to deny any involvement in the crimes, although the polygraph suggested that he was being untruthful in his responses to questions about the murder of Mrs. Brock. After Sparks concluded his interview and defendant had taken a bathroom break, Detective Hymel entered the room and, in a long and solemn speech frequently referencing defendant's recently deceased mother, calmly appealed to defendant to confess. In response, defendant became somewhat emotional and slowly began to confess, first to the Brock homicide, and then to each of the other multiple homicides[3], including the murder of Lillian Philippe.[4] These confessions were very detailed. A video tape of this interrogation and confession, along with a transcript, was introduced into evidence and played for the *100 jury. However, the two-and-one-half hour *101 portion of the interview where defendant was questioned by David Sparks and given a polygraph test was edited out and not seen or considered by the jury. The state could not produce any forensic evidence placing him at the various crime scenes, so it relied almost entirely on the confession to prove defendant's guilt at trial.[5] Throughout this confession, the jury heard evidence that large amounts of cash were stolen from most of these residences, that defendant was gambling large amounts of cash at area casinos in vast excess of his actual income, that defendant knew most of the victims[6], and appeared to have motives in addition to robbery for some of them[7], and that he knew the specific details of all the crimes.

DISCUSSION OF ASSIGNMENTS OF ERROR[8]
I. Motion to suppress.
Defendant filed a motion to suppress in which he claimed that his videotaped confession should be excluded from evidence because it had been obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and had been illegally coerced by the interrogating officers. After entertaining considerable evidence on the issue, the court denied the motion in a lengthy ruling dated April 12, 1999.
In his first argument on appeal, defendant claims that the court erred when it denied his motion and admitted the majority of the inculpatory statement[9] in which he admitted to committing the instant offense and several other aggravated burglaries and homicides. Specifically, defendant maintains that the "harsh circumstances of the lengthy interrogation, the unique susceptibilities of the defendant, and the statement's lack of consistency with the physical evidence secured during the investigation of the case" demonstrate that the state had obtained the confessions *102 through coercion and duress. He also claims that deficiencies in the state's Miranda warnings rendered the statement inadmissible.
A. The trial court correctly concluded defendant was not in custody when he voluntarily agreed to accompany the officers to the station.
First, defendant claims that the court erroneously concluded that he voluntarily accompanied officers to the substation when the circumstances of the interrogation demonstrated that he was in custody for the duration of the interview.
Miranda's prophylactic safeguards apply only to custodial interrogation, and custody is decided by two distinct inquiries: an objective assessment of the circumstances surrounding the interrogation to determine whether there is a formal arrest or restraint on freedom of the degree associated with formal arrest; and, second, an evaluation of how a reasonable person in the position of the interviewee would gauge the breadth of his freedom of action. Stansbury v. California, 511 U.S. 318, 321, 114 S.Ct. 1526, 1528-1530, 128 L.Ed.2d 293 (1994), (citing California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)).
In this case, a review of the suppression transcript and trial testimony[10] reveals that Detective Toney and Captain Mike Nettles, the two officers who went to defendant's automotive store, both testified that he agreed to accompany them to the police station to answer questions and that he was free to leave before confessing to the crimes. Defendant was not administered Miranda warnings at his place of business nor was he handcuffed while he traveled to the station in the front passenger seat of the police vehicle. In addition, at the outset of the interrogation, Detective Todd Hymel advised defendant, "[Y]ou're not being placed under arrest, I don't [want] you to miss understand [sic]." Defendant responded, ". . . well I ain't even worried about that."
This exchange demonstrates that defendant voluntarily accompanied the officers to the station, and he thus fails to show that he had been arrested on less than probable cause and consequently that subsequent statements should have been suppressed as fruits of an illegal detention. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).
In any event, immediately after informing defendant that he was not under arrest, the officers nonetheless administered the first of several sets of Miranda warnings and then began to question defendant about large sums of money he had spent in the last several months. Since defendant did not make any inculpatory admissions until after he had waived his Miranda rights, he shows no basis for suppression of his statement based on the state's failure to advise him of those rights in a timely manner.
B. The totality of the circumstances demonstrate the confession was voluntary.
Next, defendant claims that the statement should have been excluded in its *103 entirety because the state failed to establish that it had been given freely and voluntarily. In making the argument, defendant points to numerous factors which he maintains reveal the coercive nature of the interrogation.
Before the state may introduce a confession into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La. C.Cr.P. art. 703(D); State v. Simmons, 443 So.2d 512, 515 (La. 1983). If a statement is a product of custodial interrogation, the state additionally must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and, that he has a right to counsel, either retained or appointed. Miranda v. Arizona, supra. When claims of police misconduct are raised, the state must specifically rebut the allegations. State v. Vessell, 450 So.2d 938, 942-943 (La. 1984). A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless not supported by the evidence. State v. Benoit, 440 So.2d 129, 131 (La. 1983); State v. English, 582 So.2d 1358, 1364 (La.App. 2nd Cir. 1991), writ denied, 584 So.2d 1172 (La. 1991). Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence. Vessell, supra at 943. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. State v. Lavalais, 95-0320, p. 6 (La. 11/25/96), 685 So.2d 1048, 1053; State v. Lewis, 539 So.2d 1199, 1205 (La. 1989); State v. Thomas, 461 So.2d 1253 (La.App. 1st Cir. 1984), writ denied, 464 So.2d 1375 (La. 1985).
1. The Miranda colloquy reflected a knowing waiver of rights.
Defendant maintains that the record did not establish that he made a knowing waiver of his Miranda rights. Specifically, he claims that because officers did not immediately tell him that they were investigating him for the series of murders, but rather initially indicated that they were merely interested in his spending habits, he could not make an informed decision about whether to invoke his Miranda rights. Indeed, a review of the lengthy interrogation reveals that for the first hour-and-one-half of the interview by Detective Hymel's own calculation, the officers focused primarily on defendant's spending habits and purported winnings playing video poker.[11] However, as discussed *104 above, defendant was told at the outset of the interview that he was not under arrest and the circumstances of the interview demonstrated that his presence at the sheriff's substation was entirely voluntary. Given that defendant was not in custody at the time, he was not even entitled to Miranda warnings.
In addition, several weeks before the interrogation, Detective Toney spoke to defendant on the telephone and informed him that he wanted to discuss the unsolved homicides in Ascension Parish. Further, Toney told him before the interview that they were going to discuss the same things they talked about over the telephone.
In any event, a transcript of the interview reveals that officers did administer Miranda warnings before the interview commenced; that defendant indicated that he understood his rights; and that he wished to waive them. There exists no requirement that the state advise a defendant that he is a suspect in a first-degree murder for him to execute a knowing waiver of rights. See, e.g., Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (Miranda warnings alone sufficiently apprise the defendant of his Sixth Amendment right to counsel and of the consequences of abandoning that right; no additional or refined warnings needed in this context); but see State v. Cousan, 94-2503, p. 6 (La. 11/25/96), 684 So.2d 382, 386-7 (failure of the police to inform a suspect of the subject matter of interrogation "is certainly a relevant factor in reviewing the totality of the circumstances under which defendant made the incriminating remarks."); cf. La.C.Cr.P. art. 218.1 (when a person has been arrested, the police must advise him "fully of the reason for his arrest or detention . . . ").
Finally, before defendant confessed to any of the murders, he was read his rights a second time before he agreed to take a polygraph and he, himself, stated that the purpose of the examination was that the officers were "trying to find out where I get my money from and talking to me about these people [that] got killed?" Thus, defendant's claim that he did not make a knowing waiver of his rights because he was misled concerning the nature of the state's investigation does not warrant relief.
2. The length of the colloquy did not vitiate the voluntariness of the statement.
In the next portion of his claim concerning the court's ruling denying the motion to suppress, defendant maintains that given the length of the interrogation, he lacked the capacity to give a voluntary statement concerning the crimes.
The record demonstrates that defendant was at the sheriff's substation for approximately 12 hours, interrogated all the while by various police officers. However, arguably *105 at least, because defendant accompanied the officers to the station voluntarily and denied involvement in any of the murders for the first six hours, he was in police custody for only approximately half of that time.[12]
In any event, nothing suggests that the duration of the interrogation, without more, rendered it involuntary. In Ashcraft v. Tennessee, 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), the Supreme Court held that 36 hours of virtually continuous interrogation was "inherently coercive." Aside from Ashcraft, however, the Court has never clarified the point at which the length of an interrogation renders it inherently coercive and thereby involuntary. In most state cases, confessions obtained after quite lengthy interrogations have been held to be voluntary and hence admissible. See e.g., State v. Lapointe, 237 Conn. 694, 678 A.2d 942, 959-60 (1996) (holding that nine-hour interrogation of brain damaged defendant did not render resulting confession involuntary); Burk v. State, 848 P.2d 225, 233 (Wyo. 1993) (holding that statements obtained from defendant who was questioned from 8:50 a.m. through the entire day and night were properly admitted).
In addition, while not dispositive on the issue of whether the confession was illegally coerced, the fact that officers administered Miranda warnings nine times during the interrogation weighs in favor of the state on the issue of voluntariness. See e.g., United States v. Huerta, 239 F.3d 865, 871-72 (7th Cir. 2001) (confession voluntary in part because defendant received Miranda warnings three times and executed written waiver); Rook v. Rice, 783 F.2d 401, 404-05 (4th Cir. 1986) (confession voluntary despite defendant's low intelligence, 7th grade education, and statement by police that "the only thing that could help him was to tell the truth" because he was given Miranda warnings twice and indicated that he understood them).
In this case, defendant made several trips to the restroom and drank sodas throughout the interrogation. Although defendant expressed weariness, stated that he was cold, and indicated that he was suffering from back pain intermittently throughout the lengthy interview, he never requested to terminate the interrogation nor did he ever invoke any of his Miranda rights. In these circumstances, defendant does not demonstrate coercion resulting *106 from the protracted duration of the interrogation.
3. Physical and mental distress did not render the statement involuntary.
Next, defendant claims that mental and physical duress during the interrogation caused him to confess to the various offenses involuntarily. In support, he points to several instances in which either he or the officers mentioned that he appeared cold, that his back, head or chest was hurting, or that he appeared tired during the interview. Defendant also claims that the officers coerced his confession by making several references to God, religion and his deceased mother. Finally, defendant complains because he was denied the opportunity to smoke a cigarette at one point during the interrogation because the building where the interview occurred did not allow it.
While defendant's factual allegations are accurate, he does not show that any of the state's conduct coerced his admissions or rendered the confession involuntary.[13] Our review of the videotapes and the verbatim transcript does not show the officers exercising any type of coercion which would at all indicate that this confession was involuntary. To the contrary, the *107 vast majority of the interview was extremely benign on the part of the officers and Blank was treated very well throughout. In response to defendant's specific examples of coercive conduct, it is evident from the record that defendant did not request food during the interview, during which, notably, none of the interrogators stopped to eat a meal. Despite intermittent statements expressing fatigue and or physical discomfort, defendant never requested to terminate the interview. Moreover, for the most part, officers accommodated defendant when possible, providing him drinks, allowing him to use the rest-room and heating the interrogation room. While at first the officers denied defendant's request to smoke, after he smoked a cigarette while he was alone in the bathroom, they continued to let him smoke, *108 and he was allowed to smoke before he confessed to any crimes. As to the references to defendant's deceased mother, appeals to a defendant's emotions and/or religious beliefs typically do not render an ensuing confession involuntary. See e.g., Johnson v. Trigg, 28 F.3d 639, 644-45 (7th Cir. 1994) (confession voluntary even though 14-year-old defendant of below average intelligence saw police arrest terminally ill mother before confessing); United States v. Miller, 984 F.2d 1028, 1031-32 (9th Cir. 1993) (confession voluntary even though officer, a Mormon bishop, lectured to Mormon defendant that religious tenets required repentance and restitution for wrongdoing). This claim lacks merit.
4. The interrogators' badgering did not render the statement involuntary.
Defendant also claims that the officers' relentless exhortations that he tell the truth in conjunction with false suggestions indicating that they possessed forensic evidence of his guilt, illegally coerced the confession.[14] Defendant claims that during the interrogation, officers used the word "truth" no less than 30 times, including several communications in which they urged that he answer their questions truthfully.
Courts have routinely held that a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession. State v. Petterway, 403 So.2d 1157, 1159-60 (La. 1981); State v. Magee, 93-0643, pp. 3-4 (La.App. 3d Cir. 10/5/94), 643 So.2d 497, 499; State v. English, supra at 1364.
In this case, although the officers repeatedly admonished defendant to tell the truth throughout the interrogation, they *109 did not promise him anything in exchange for the confession except for the suggestion that he could clear his conscience. Notably, in State v. Lavalais, supra at 1053, this Court held that an officer's comments to the defendant that he would likely receive more favorable treatment if he confessed as opposed to failing a polygraph examination did not constitute inducements rendering the subsequent confession involuntary. See also State v. Rochester, 301 S.C. 196, 391 S.E.2d 244, 247 (1990) (advice to defendant from polygraph examiner that it would be "in his best interest to tell the truth" does not render ensuing statement inadmissible). In this situation, defendant fails to show the existence of coercion rendering the statement involuntary.
5. The threat, and ultimate administration of the polygraph examination, did not demonstrate coercion.
Defendant also maintains that officers illegally coerced the confession because not only was he "pressured into submitting to the polygraph exam here, a factor affecting voluntariness, but the results were then used to further intimidate him, thus taking him farther afield from the realm of free and voluntary."
The record reveals that although defendant expressed some reluctance about taking the polygraph, Agent Sparks advised him that he was not required to submit to the examination and administered Miranda warnings. Defendant ultimately waived his rights and submitted to the polygraph test. This Court has upheld the admissibility of a defendant's statement in similar circumstances. See State v. Green, 443 So.2d 531, 536 (La. 1983) (under totality of circumstances, when defendant was advised of his rights before polygraph test, when defendant had not previously asserted his right to counsel, and when defendant's attorney had agreed to polygraph and set no parameters for its conduct, defendant voluntarily waived his right to counsel although defendant was not readvised of his Miranda rights after polygraphist confronted defendant at conclusion of test with his failure to tell the truth which led to confession). Generally speaking, jurisprudence from other jurisdictions also suggests that confessions are not rendered involuntary because they have been made in anticipation of, during, or following a polygraph examination. See e.g. Wyrick v. Fields, 459 U.S. 42, 48-49, 103 S.Ct. 394, 397, 74 L.Ed.2d 214 (1982) (Per Curiam) (post-polygraph inculpatory statements are admissible if the defendant waived his Miranda rights before taking the test); United States v. Little Bear, 583 F.2d 411, 414 (8th Cir. 1978) (despite "concern" over procedure used by agents where record did not indicate that defendant could refuse to take polygraph test, discontinue it at any point or decline to answer questions, evidence supported trial court's conclusion that she confessed voluntarily); State v. Morton, 155 N.J. 383, 715 A.2d 228, 262 (1998) (subjecting defendant to polygraph did not impugn voluntariness of confession when interrogating officers advised him of right to refuse test, to discontinue test, and to refuse to answer any questions); Lee v. State, 338 So.2d 395, 397 (Miss. 1976) (confession made following polygraph examination held voluntary when defendant consented to examination and was adequately advised of his rights prior to administration of test).
In addition, Detective Hymel's statement that "we got some serious talking we need to do" if defendant refused the polygraph did not render the subsequent confession involuntary as Agent Sparks subsequently administered Miranda warnings and informed defendant that he could refuse the polygraph before he submitted to *110 the examination. Cf. State v. Istre, 407 So.2d 1183, 1187 (La. 1981) (reh'g denied) (officer telling defendant that he would be taken upstairs and booked if he did not want to talk did not render confession involuntary). Accordingly, defendant does not show that the court erred when it deemed the confession admissible merely because it occurred after he voluntarily submitted to the polygraph examination.
C. The state did not fail to advise defendant that he could terminate the interrogation.
Next, defendant claims that "[t]he transcript of the interrogation . . . reflects that the initial provision of rights did not inform" him that following his initial waiver, he could later exercise his right to refuse to answer additional questions. As a result, he claims that the Miranda warnings were insufficient and hence that his confession should have been excluded.
Although officers did not expressly inform defendant that he could exercise his right to cease answering questions during the interview, he fails to show grounds for relief. Although Miranda zealously protects the right of an arrestee to terminate custodial interrogation at any point he chooses, 384 U.S. at 445, 86 S.Ct. at 1612, and the police must scrupulously honor the assertion of that right, Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), Miranda did not expressly require that advice as a subpart of the broader advisement with respect to the right to remain silent. State v. Chevalier, 458 So.2d 507, 514 (La.App. 4 th Cir. 1984). Further, the right to remain silent embodies the right to terminate questioning. It is the tool by which a suspect can control the time of questioning, the topics discussed, and duration of the session. State v. Phillips, 444 So.2d 1196, 1198, n. 5 (La. 1984), (discussing Michigan v. Mosley); State v. Loyd, 425 So.2d 710, 716 (La. 1982). As noted by the trial court in its ruling, officers administered Miranda warnings no less than nine times during the interview, and in these circumstances, defendant makes no showing that he did not know he could terminate the interrogation. This claim lacks merit.
D. The state did not erroneously fail to advise defendant of the charges against him.
Defendant also claims that the state's failure to inform him that he faced first-degree murder charges rendered the waiver of Miranda rights involuntary.
As an initial matter, as discussed above, defendant accompanied the officers to the sheriff's substation voluntarily and was free to leave before he finally confessed to the first murder. Because defendant's presence was voluntary, the state was not required to inform him that it suspected his participation in the multiple murders. In any event, the officers had informed him by telephone several weeks earlier that they wanted to talk to him about multiple homicides in the area and reinforced that before the interview began. Further, defendant clearly knew why he was being interviewed as he stated that the purpose of the examination that the officers were "trying to find out where I get my money from and talking to me about these people [that] got killed."
Moreover, after defendant admitted to killing Joan Brock, the state administered another set of Miranda warnings and defendant executed a written waiver which clearly states that the investigation related to "L.R.S. 14:30 Homicide." Accordingly, defendant's claim that that he did not knowingly waive his rights as a result of the state's failure to set forth the charges against him lacks merit.
*111 E. The Supreme Court's recent holding in Missouri v. Seibert does not require reversal of the district court's ruling admitting the statement.
Next, defendant claims that admission of his confession violated the United States Supreme Court's recent holding in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), because the state failed to administer a complete set of Miranda warnings before acquiring the confession.
The Supreme Court held in Seibert that Miranda warnings given mid-interrogation and after the defendant had confessed were ineffective and thus a second confession repeated immediately afterwards was not admissible because "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." Id., 124 S.Ct. at 2611.[15]
In this case, officers administered valid Miranda warnings immediately after defendant voluntarily accompanied them to the sheriff's substation. Defendant waived his Miranda rights, stating, "I'll answer anything you ask, I mean I ain't got nothing to hide." Before making any inculpatory admissions, defendant received a second set of Miranda warnings from FBI Agent David Sparks who subsequently administered the polygraph test; and again, defendant waived his rights. All in all, defendant was Mirandized nine times. As a result, defendant shows no basis for suppression of his statement under Seibert.
F. Factual inconsistencies between the physical evidence and the confession do not demonstrate that it was involuntary.
Defendant also claims that the court erred when it did not take into account inconsistencies in his confession and the physical evidence when considering the issue of voluntariness. Specifically, defendant points to the portion of his confession in which he claimed that he entered the victim's residence by prying open a vent hole in her roof, lowering himself into the attic, and then climbing down a ladder into her hallway. He maintains that entry in this manner would have been impossible because of the small size of the hole in the roof and evidence demonstrating that dust had not been disturbed on beams below the hole.[16]
*112 However, even assuming the confession to Philippe's murder contained some minor inaccuracies, Detective Toney testified that it also provided critical information about the crime that had not been released to the public, such as the fact that a trophy had been used to beat the victim during the attack, that the intruder had rifled through the victim's purse and left it in her bathroom, that the safe was located in the bedroom closet, and that the attic ladder folded down into the hallway. Further, the defendant's confession to the other murders contained details that turned out to be true and that only the murderer would know.
In any event, the truthfulness of the confession appears primarily an issue for the jury to decide when considering the sufficiency of the evidence rather than a critical factor for the judge to consider when deciding whether the statement was voluntary. See Jackson v. Denno, 378 U.S. 368, 386-87, 84 S.Ct. 1774, 1786, 12 L.Ed.2d 908 (1964) (holding that truthfulness of confession is irrelevant to the voluntariness inquiry); Doby v. South Carolina, 741 F.2d 76, 78 (4th Cir. 1984) (trial court erred by considering truthfulness of confession when determining statement's voluntariness). Thus, even assuming some minor inconsistencies in defendant's statement and the physical evidence, he fails to show the court erred when it admitted the confession.[17]
II. Voir Dire Errors
A. Defendant's challenges for cause to prospective jurors based on their inability to return a life sentence.
In this argument, defendant claims that the court erroneously ruled on various cause challenges based on six prospective jurors' inability to consider both a life sentence and a death verdict when considering the appropriate penalty for first-degree murder.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair *113 the performance of his duties as a juror in accordance with his instructions and his oath." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La. 1992), rev'd. on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and . . . will automatically vote for the death penalty under the factual circumstances of the case before him. . . ." State v. Robertson, 92-2660 (La. 1994), 630 So.2d 1278, 1284.[18] Jurors who cannot consider both a life sentence and a death sentence are "not impartial," and cannot "accept the law as given . . . by the court." La.C.Cr.P. art. 797(2),(4); State v. Maxie, 93-2158, p. 16 (La. 4/10/95), 653 So.2d 526, 534-35. In other words, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause. State v. Taylor, 99-1311, p. 8 (La. 1/17/01), 781 So.2d 1205, 1214.
A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683, 686-687. "A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence." State v. Robertson, supra; State v. Cross, supra.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant exhausts his peremptory challenges. State v. Robertson, supra at 1280; State v. Ross, 623 So.2d 643, 644 (La. 1993). In Louisiana, a defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal.[19]State v. Connolly, 96-1680, p. 8 (La. 7/1/97), 700 So.2d 810, 818; State v. *114 Bourque, 622 So.2d 198, 229-30 (La. 1993); State v. Fallon, 290 So.2d 273, 282 (La. 1974). An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Cross, supra at 686; State v. Bourque, supra at 225.
1. Jeanette E. Theriot: Defendant claims that the court should have granted his challenge for cause to prospective juror Jeanette Theriot because she indicated that she could consider a life-sentence only in circumstances in which the murder was "justified." Jeanette Theriot was among the first of three large panels of prospective jurors. She was questioned on voir dire in the fourth group in Panel One. The groups were first questioned as to death-phase qualifications and for cause challenges were made at that time. Theriot was challenged for cause and the trial court denied that challenge. The jurors in groups A-D of Panel One remaining after the for cause challenges then underwent general voir dire questioning and counsel were given the opportunity to exercise their peremptory challenges. Instead of exercising one of his twelve peremptory challenges then available against Theriot, defense counsel agreed with the State that she be selected as a juror, and she did indeed sit as a juror. Because he did not exercise an available peremptory challenge against Theriot, any erroneous ruling by the trial court did not deprive defendant of a peremptory challenge; thus, defendant waived his right to assert this claim on appeal. State v. Connolly, supra at 818; State v. Bourque, supra at 229.
2. Joshua P. Foret: Next, defendant claims that the court erred when it denied his challenge for cause to Joshua Foret because he "unequivocally expressed the opinion that he would automatically vote for the death penalty under the circumstances of the case."
Foret appeared on the same panel as Theriot and when initially examined by the state, he indicated that he could consider mitigation evidence before deciding on an appropriate sentence. Specifically, he answered that he would not disagree that a person's mental state and capacity was a mitigating factor that the jury must consider, and he agreed that a mental disease or defect or drunkenness was a mitigating factor a juror must consider. He also agreed that "if the circumstances justify it," he could consider voting for both life imprisonment and the death penalty. Defense counsel followed up on Foret's attitude concerning mitigation evidence. After Theriot answered a question indicating her opinion that she would not consider mitigating factors in the case of an aggravated burglary, Defense counsel asked:
Q: Okay. That's what I'm trying to understand. Mr. Foret, about what you [sic]?
A: Yes, sir. If the evidence is proved, proved beyond a reasonable doubt, I could consider the death penalty. I can consider the circumstances.
Q: The mitigating circumstances?
A: Yes, sir.
Q: Okay. You can understand that the mitigating circumstances are not an excuse for anything.
A. Yes, sir.
Q: It's not saying it's okay to do it if you have one of these mitigating circumstances.
A: Yes, sir. And if the evidence if there to prove beyond a reasonable doubt that the crime was committed, I can consider the death penalty.
Q: Okay. But that would be after you considered the mitigating circumstances?

*115 A: Yes, sir.
Q: And you're not likeor, do you agree with some of the other individuals who testified and said that if it's proven that Mr. Blank committed a murder, a homicide, killed an individual during the course of an [a]ggravated [b]urglary, that you would feel that automatically would make youif it's proven beyond a reasonable doubt and you're satisfied that it's been proved, that you would have to vote for the death penalty?
A: Yes, sir.
Q: You would?
A: Yes, sir.
Q: Is that the way you feel?
A: Yes, sir.
Q: As I said, there are not any right or wrong answers. We may have an individual up here that says, "I don't know. I don't think killing someone is that big a deal. I don't think anybody ought to get killed for killing someone." But nobody that I know feels like that.
But I'm saying the way wethe point I'm trying to make is that each of us feel a little bit differently about it. And each of us, if we are asked over a cup of coffee or a cold drink, "How do you feel about the death penalty," say, "Well, I feel," and you say it, and sometimes you haven't even thought about it that much. This is when it's time to fish or cut bait. We have to decide how we feel about it. Under oath and talking to lawyers that go on and on and on. Okay?
What I am saying is are you telling me that if an individual is convicted of going in someone's home and killing the individual while they are in there that you would have to vote for the death penalty?
A: Yes, sir.
Q: And you would do that automatically? That's the way you feel?
A: Yes, sir.
Q: And the mitigating factors, the fact that someone was young or didn't have a prior record, wouldn't even come into your mind?
A: Well, there areyeah, the mental, intoxication, there would be factors that I would consider, but under the circumstancesifif the evidence has proved that it was done, I believe in the death penalty, yes, sir.
Q: Okay. But you would consider some of these?
A: Yes, sir.
Q: Which ones? You said mental?
A: I could consider the mental, yes, sir.
Q: What about the fact that the person didn't have any prior criminal record; would that bother you?
A: That wouldn't swing me, no, sir.
Q: That would make any difference to you?
A: Not really.
Q: Okay. Let me ask you this. At the second phase of the trial, what we call the penalty phase, the second trial, if the second trial is ever reached, the State is allowed to bring out what is called evidence about the character and propensities of the person accused. Okay? And they can bring out anything that fits under the law.
If it were shown at this second trial that the person being tried had committed another murder, an unrelated murder, not the one he's on trial for, but a separate murder, would that keep you from considering any mitigating circumstances? Would that cross the line in your mind?

*116 A: Well, I would sayummit might throw out the mitigatingyeah, it might throw out the circumstances.
Q: The point I am trying to make is I believe that there is probably some point in everyone's mind where they would agree that mitigating is just humbug. Okay? Mr. Long talked about if Hitler came back. Okay? Hitler was a terrible person responsiblethat was before your time, but I assume everybody knows about Hitler.
A: Yes, sir.
Q: He was responsible for millions of deaths. Okay? And I'm sure that many, especially people from that time, many jurors that would sit there and I would say, "Can you consider these mitigating circumstances in regard to Mr. Hitler," and they would have to say, "No. Too bad. What he did was too bad. None of these would have any impact." Okay?
I'm saying if you could backwards from a million
After the State objected to defense counsel's questioning regarding Hitler, and after the trial judge instructed the prospective jurors on the guilt and penalty phase, questioning of Foret continued:
Q: Mr. Foret, I don't believe we have finished. When we were talking a moment ago, we were talking about there being circumstances in which you would reach a point where you could no longer or would no longer consider any mitigating factors; is that right?
A: Yes, sir.
Q: And I had talked about Hitler, if Hitler were on trial and you knew of all the millions of people that he had killed, that might be a situation where you would say, "I'm sorry. It's too bad a situation. I can't consider it. I'm voting for the death penalty, period. I am not going to think about those." Do you understand what I'm saying?
A: Yes, sir.
Q: And I asked youand I'm sure that there is some point for everyone, but I would ask you if the fact that there was maybe multiple homicides, more than one person killed in a situation, would that keep you from considering mitigating evidence?
A: Yes, sir.
Q: And that's just the way you feel?
A: Yes, sir.
Before denying the challenge, the court summarized Foret's responses on the questionnaire and testimony at voir dire:
"I believe the death penalty should be around. If someone should commit a serious crime punishable by the death penalty, it should be enforced . . . would consider `drunk' as a mitigating circumstance, yes." "If circumstances showed it, could you vote for death?" "Yes." "If circumstances showed it, could you vote for life?" "Yes." "If evidence proved beyond a reasonable doubt death penalty, I could consider the mitigating circumstances . . . after considering the mitigating circumstances . . . if guilty beyond a reasonable doubt, vote for the death penalty."
* * *
"If convicted . . . going into someone's home . . . vote for the death penalty." And you were asking there whether or not that would be automatic. "There would be factors I would consider. Mental, drunk could consider mental." "No prior criminal record?" He said, "Wouldn't sway me." Now, that's not saying he wouldn't

*117 * * *
He didn't say he wouldn't consider it. He said that that particular factor wouldn't sway him. Well, in any one of those lists there might be a factor that wouldn't sway you, but he said he would consider them all. "If shown defendant had committed another murder, would that cross the line?" "Yes, it might throw out the mitigating circumstances." "If Hitler came back," etc. . . .
I don't think he is a cause. I think he stays.
Defendant exercised a peremptory challenge against Foret. Defendant maintains that the court's ruling violated Witherspoon because the juror's last responses suggested that he would not consider mitigation evidence in a case involving multiple killings. Given the state's expected (and actual) presentation of evidence that defendant committed multiple murders, defendant claims that Foret was not competent to serve.
As we explained in State v. Lucky, even a strong predisposition towards capital punishment does not disqualify a prospective juror, or at least a trial judge does not abuse his or her broad discretion by so finding, if the juror's responses as a whole fairly support a conclusion that the juror would keep an open mind about penalty, no matter how grudgingly, until all of the evidence has been presented. State v. Lucky, 96-1687 (La. 4/13/99), 755 So.2d 845, 851 ("[T]he trial judge perceived [the juror's] responses to mean that his predisposition toward the death penalty, balanced with a willingness to consider mitigating circumstances and to credit those that he deemed `pretty heavy,' did not significantly impair [the juror's] performance of his duties as a juror in accordance with his instructions and his oath."). In this grey area, "the critical determination of whether such predisposition constitutes substantial impairment is within the province of the trial judge's discretion." State v. Higgins, 03-1980 (La. 4/01/05), 898 So.2d 1219, 1238 (citing Lucky, supra at 850-51).
This Court has been confronted with this vexing issue numerous times. In some cases, the denial of a challenge for cause constituted reversible error. See State v. Divers, 94-0756, pp. 8-13 (La. 9/5/96), 681 So.2d 320, 324-27 (challenges to two jurors who felt that any "deliberate" or "intentional" killing merited the death penalty should have been granted); Maxie, supra at 537-38 (error not to disqualify juror who could listen to mitigating evidence but viewed death as the only appropriate penalty, "[o]nce the crime guilt is established"); Robertson, supra at 1281-84 (error not to grant challenge for juror who would vote automatically for death if the accused were convicted of the double murders charged;) Ross, supra at 644 (error to deny challenge for juror who felt that the "only penalty" upon conviction of first-degree murder was death).[20]See also State v. Jacobs, 99-1659 *118 (La. 6/29/01), 789 So.2d 1280 (error to deny a challenge for cause to two prospective jurors who expressed a pro-death sentiment, where there was no attempt to rehabilitate them and voir dire was devoid of any meaningful discussion by the state, defense counsel, or the trial judge of the role mitigating circumstances play in Louisiana's bifurcated capital sentencing procedure).
However, other jurisprudence has upheld trial courts' determinations that the juror was not disqualified by his or her predisposition towards the death penalty. State v. Juniors, 03-2425 (La. 6/29/05), 915 So.2d 291; State v. Higgins, supra at 1236-39; State v. Ball, 00-2277, pp. 11-25 (La. 1/25/02), 824 So.2d 1089, 1101-1111; State v. Lucky, supra at 848-51; State v. Taylor, supra at 1215-16; State v. Chester, 97-2790 (La. 12/1/98), 724 So.2d 1276, 1284-86; State v. Hart, 96-0697 (La. 3/7/97), 691 So.2d 651, 656-58. In Juniors, for example, the prospective juror stated flatly that she believed in the proverbial and Biblical "eye for an eye," which meant, in a capital case, death for death. In Ball, one of the challenged jurors expressed her opinion that she would automatically vote for death in any case in which the offender intentionally killed. In each instance, the Court found, after a painstaking parsing of the jurors' responses as a whole, no abuse of discretion by the trial court in denying the cause challenges. Thus, in Juniors, further questioning by defense counsel, which led the juror to state that she would not violate the law and that she would abide by an instruction from the court to consider any mitigating evidence, sufficiently rehabilitated the juror. Juniors, supra. In Ball, although neither the state nor the court attempted to rehabilitate the juror, the Court found that the totality of the juror's responses, including those to general questioning which indicated that she could consider both death and life imprisonment, reflected her "ability to consider the whole picture before deciding what sentence to impose." Ball, supra at 1108.
Considering the above, we find that the trial court did not abuse its discretion in refusing to disqualify Foret for cause. Here, the trial court's ruling raises a difficult question because the discussion of multiple murders occurred in the context of the extreme Adolph Hitler hypothetical. Clearly, a person's attitudes towards Hitler do not serve as a litmus test for selection on a capital jury. That a juror could vote for death in Hitler's case but would hesitate to do so in any other case does not disqualify him for jury selection under Witt's "substantial impairment" standard; nor would a jurors belief that no amount of mitigating evidence would lead him or her to spare Hitler's life disqualify the juror from service under the same standard if he or she expressed a willingness to consider mitigating evidence in less extreme circumstances more akin to the facts of the particular case. In addition, a defendant who has committed multiple murders is scarcely in a position to complain that jurors may express a strong predisposition towards the death penalty under those circumstances. The best he can reasonably hope for is that the juror will not reach his sentencing determination until all of the evidence has been presented and argued and will consider, but not necessarily be convinced by, the mitigating factors presented. Given Foret's general statements that he would consider mitigating circumstances before imposing a penalty, and that he would consider certain mitigating circumstances in the case of a home-invasion *119 murder, the trial court could reasonably have understood the prospective juror's comment about multiple homicides as reflecting nothing more than agreement with defense counsel in principle that some cases (such as Hitler's) are so extreme that mitigating evidence simply drops out of the picture. Given the vast discretion given to trial courts in this area, and considering the judge's close attention and consideration to this juror, we find that the trial court did not err in denying this challenge for cause.
3. Dudley J. Hebert: Next, defendant claims that the court should have granted his challenge to prospective juror Dudley Hebert because his responses demonstrated "that the only mitigation he would consider was innocence."
Like the rest of the jurors on his panel, when examined by the state, Hebert stated that he would consider mitigation evidence and "sure could" vote for life if the circumstances dictated it was the appropriate punishment.
Later, when examined by the defense, Hebert stated that he would also have to consider the impact his decision would have on the victim's family. When counsel asked if his responses indicated that he would be leaning towards returning a death verdict before considering any evidence presented at the sentencing hearing, Hebert stated, "Well, it all depends on what I hear. I would keep all of this in mind, but you've got to think whoit could be your family, I mean." The following exchange then transpired:
Q: If you're thinking, "Someone is convicted of First Degree Murder and that could be my family, so I want the death penalty for them just like I would want the death penalty for somebody that is murdered in my family?"
A: If it's proven, right.
Q: So you would be for the death penalty?
A: Right. If it's proven.
Q: If he's proven guilty of First Degree Murder?
A: Right.
Q: I've got to write that down. I will forget it if I don't. And that's the way you feel, and I'm not going to talk you into it or out of it?
A: Well, I mean, I'm going to take all of that into consideration, too, but I mean, I would have to weigh itI'd be leaning that way.
The court denied defendant's ensuing challenge for cause, summarizing the juror's testimony:
Dudley Hebert. "Could vote for the death penalty. Could vote for life. Sure could. He was a man of one word on his questionnaire. What do you think about it, and he just put, "Good." "Could you vote if your vote put him to death?" "Sure could. I kind of feel like [prospective juror] Mr. Harper. You've got to think of the family. If he's proven guilty, I can consider all of this, but I've got to think the other way too. Life, death, can do it."
. . . . "All depends on what I hear. I'll keep all of this in mind, but you've got to think it could be my family." "Death penalty, if proven guilty, First Degree Murder. I am going to take all of this into consideration too, but I am leaning that way."
Effect of multiple homicide, it would be the same. I kind of agree with [the state's argument] that the defense got to loading the wagon with the questions and how horrible they ended. I don't think and I don't put Hebert and [excused juror] Harper in the same bucket, *120 so to speak, so I say no challenge for cause.
Defendant subsequently exercised a peremptory challenge against Hebert.
The court's reference to counsel's inquiries suggests its belief that the defense could not demonstrate prospective jurors' inability to consider voting for life imprisonment merely by proposing to them the most gruesome scenarios and then showing that in those cases, they expressed serious reservations about whether they could be swayed by mitigation evidence. As discussed above, a juror's attitude toward extreme hypothetical situations Adolph Hitler or the murder of the juror's family memberdoes not serve as a fair litmus test of the juror's qualification to sit on a capital case. In the end, that Hebert would be leaning towards capital punishment yet still able to consider mitigating circumstances, did not disqualify him.
Given the deference afforded to the trial court and the defense's failure to show Hebert's answers demonstrated that he categorically would not consider mitigation evidence, defendant fails to show that the court erred when it did not excuse the juror for cause.
4. Jerry D. Dover, Jr. Next, defendant claims that the court should have excused Jerry Dover because "he would vote for the death penalty upon a guilty verdict for first degree murder."
The substance of Dover's voir dire testimony resembled that provided by Hebert. When questioned by the state, the prospective juror initially indicated that he could vote for either life imprisonment or the death penalty and would consider mitigation evidence.
However, when defense counsel questioned the panel, the following exchange occurred:
Q: What if it were shown that there were four or five murders; would you still consider the mitigating factors before you would vote?
A: (Owen Breaux, Jr.) You would have to weigh everything, yes, sir.
Q: What do you think, Mr. Dover?
A: (Terry Dover, Jr.) I'm basically the same way he feels. I would consider the circumstances. But my honest, real feeling on the matter is if somebody commits that type of crime, that's what I would want done if that crime was done to me or somebody in my family. That's the way I would feel. . . .
Q: . . . [I]f you say, "I think if someone kills someone the proper penalty is death, and that's the way I feel, period," we don't send you home with an "F" on your report card. We are just trying to find out. If that's the way you feel, that's the way you feel. Would that be an accurate description of your feelings?
A: Yes, sir.
Q: Okay. And if someone takes a human life, and they are proven guilty of First Degree Murder where there's no excuse for it, then you would vote for the death penalty?
A: Yes, sir.
Q: And mitigation would be nice, but in your mind you would be death penalty all they way?
A: Yes, sir.
Q: I seem a little apologetic for that. I hope I'm notthere's nothinglike I said, some people feel, "No death penalty under any circumstances. I don't want to be a part of it." And that's a correct answer. If you say, "If someone kills someone, I feel strongly enough about it that I *121 think that they ought to be killed themselves after he's proven guilty," then there's nothing wrong with that.
A: The only way I can come about trying to think about this would be, you know, if he did it to someone in my family. That's the only way I can think of it.
The court denied the defense challenge for cause, summarizing Dover's comments:
"If a person has taken someone's life, he or she should receive the death penalty" That's what he put on the questionnaire. "The only way to answer, if a loved one had that done to him, would you consider death?" "Yes." "Would you consider life?" "Would you consider mitigating circumstances?" "Yes."
By [the state] "If it was one or 100 people, would you consider mitigating circumstances?" And he says, "Yes."
Then you asked [prospective juror] Mr. Breaux some questions. The Defense asked Mr. Breaux some questions about, "Would you consider or would mitigating factors go to second phase, would you go in with an open[] mind?" And he said, "Yes." "Four or five murders?" He said he would have to weigh the circumstances.
Then you jumped to Mr. Dover and asked him the same question about if there were four or five. He says, "I feel like Mr. Breaux, but if done to a member of my family it's no excuse." "Mitigating would be nice," says [defense counsel] "but in your mind you would be for the death penalty all the way?" And he says, "Yes. The only way I could think about this, if it would be some member of my family."
And I think he is saying if you kill some member of his family then he's not going to consider anything whatsoever.
* * *
But he has given enough positive answers to mitigating factors that you don't get a challenge for cause on him.
Defendant subsequently exercised a peremptory challenge against Dover.
Dover's statement that he would vote for death in any case involving the death of one of his family members did not disqualify him from service on the jury in the present case which had an entirely different set of circumstances. Further, Dover initially stated that he could consider mitigating circumstances and he even agreed with prospective juror Breaux that he would do so in a case involving four or five murders. Dover may have understood counsel's questions to refer specifically and only to the situation in which the victim was a member of his own family. Given this ambiguity and considering his responses in their entirety, the trial court did not abuse its discretion in denying the cause challenge on the basis of the prospective juror's remarks in their entirety.
5. Dennis M. Petrie: Defendant alleges that the court erroneously denied his cause challenge to prospective juror Dennis Petrie as he stated that he would impose the death penalty because "it is needed" as a deterrent.
When examined by the state, Petrie indicated that he could vote for life imprisonment "if the circumstances justified it."
On cross, after defense counsel inquired about a case involving multiple murders, the prospective juror maintained that he would consider mitigating evidence but stated he would vote for the death penalty "[i]f it's needed" and agreed that its imposition could have a deterrent effect. Later, in response to defense counsel's leading questions, he indicated that that while he would "think about and consider" the *122 statutory mitigating circumstances, he would vote for the death penalty if the state proved defendant's guilt beyond a reasonable doubt.
After the parties presented argument on the issue of the defense cause challenge to Petrie, the court summarized the prospective juror's responses to inquiries about imposition of the death penalty:
Okay. Youth of the defendant as a mitigating circumstance. "Could you consider?" "Yes." . . . "If circumstances showed it, could you vote for the death penalty?" "Yes." "If circumstances showed it, could you vote for life?" "Yes." "If the decision was yours to make . . .?" Yes, he could make it.
"Mr. Petrie, what about" and you gave an example that I didn't write down [defense counsel]. "I would consider mitigating circumstances. I say the death penalty is needed. If in the back of somebody's mind," meaning the death penalty, "if I do this and there is a death penalty it is a deterrent," so he thinks it's a good thing. "If I was ordered by the [j]udge . . . I would consider mitigating circumstances." And then [defense counsel] asked him, "If the [j]udge told you to fly out of the chair . . .," and he says, "Well, I would protest. I might hurt myself and I don't think that would be a wise thing to do." I think that was kind of an off-the-wall question.
* * *
Considering mitigation factors. "I guess I would consider." "But you would still go for the death penalty?" "I would consider but strong feeling a death penalty appropriate." "If he had a good work history, I would consider it, but if it's needed I would go for the death penalty." I think he stays.
Defendant subsequently exercised a peremptory challenge against Petrie.
Like the majority of the court's rulings on defendant's reverse-Witherspoon challenges, it would certainly have been preferable had Petrie been rehabilitated following his responses to defense counsel's somewhat-leading inquiries concerning his ability to give meaningful consideration to mitigation evidence. Nonetheless, the trial court fairly described Petrie's testimony and defendant fails to show that it abused its discretion when it determined that his attitudes about the death penalty would not substantially impair the prospective juror from voting for life imprisonment.
6. Wayne P. Eschete: Defendant claims juror Wayne Eschete should have been removed for cause because his testimony indicated that he would automatically vote for the death penalty notwithstanding any mitigation the defense might introduce if the state demonstrated that he committed "a series of aggravated burglaries where people were killed." However, just like Theriot, because defense counsel failed to exercise one of its twelve available peremptory challenges against him, this claim is waived. State v. Connolly, supra.
III. Other Crimes Evidence
In these arguments, defendant claims that the court erred when it admitted evidence at the guilt phase of five other capital murders and two attempted murder to which defendant confessed. First, defendant maintains that the state failed to provide timely notice concerning its intent to introduce the evidence. Then, in related arguments concerning the substantive ruling about the state's introduction of the other murders, defendant first claims that the state introduced the evidence for the prohibited purpose of showing that he acted in conformity therewith and to demonstrate *123 modus operandi.[21] On the issue of intent, he claims that because the interrogators' questions prompted defendant to claim that he acted in self-defense when he killed the victim, the state should not have then been permitted to introduce the other murders to show that he possessed the specific intent to kill or inflict great bodily harm in the instant case. Moreover, he claims that even if the evidence was relevant to demonstrate intent, the court should have nonetheless excluded it given the overwhelming prejudicial effect admission of the multiple murders would have on the jury. Finally, he claims that the court read an erroneous limiting instruction concerning the crimes evidence.
Evidence of other crimes, wrongs, or acts is generally inadmissible to impeach the character of the accused. La.C.E. art. 404(B); State v. Talbert, 416 So.2d 97, 99 (La.1982); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, such evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or . . . (res gestae)." La.C.E. art. 404(B)(1). When the other crimes are offered for a purpose allowed under Article 404, the state is required to prove that the defendant committed these other acts by clear and convincing evidence.[22]See State v. Davis, 449 So.2d 466, 468 (La.1984). Additionally, the state must provide the defendant with notice before trial that it intends to offer prior crimes evidence. Prieur, 277 So.2d at 130. Even when other crimes are relevant, the probative value of unrelated offenses must be weighed against their possible prejudicial effect. Id., 277 So.2d at 128.
First, defendant claims that the state's notice that it intended to introduce evidence of other crimes, filed approximately one month before trial and well beyond the court's deadline of November 1, 1998, for filing pre-trial motions, was not timely and "therefore should have been denied outright as untimely and inadequate."[23] However, even assuming that *124 the state's notice of its intent to introduce the other crimes evidence was not filed in a timely manner,[24] not every violation of pre-trial procedures, including Prieur violations, requires reversal. Before a defendant can complain of such a violation, he must show prejudice. State v. Sanders, 93-0001, p. 14 (La.11/30/94), 648 So.2d 1272, 1284 (citing State v. Hooks, 421 So.2d 880 (La.1982)); State v. Strickland, 398 So.2d 1062 (La.1981). Prieur speaks of the "substantial risk of grave prejudice" to a defendant arising out of inadmissible or surprise admission of other crimes evidence, but does not presume that prejudice. Prieur, supra at 128.
In this case, notwithstanding the state's failure to file its formal Prieur notice earlier, defendant clearly knew that the state would introduce evidence of the other crimes at the penalty phase, given the court's ruling on April 12, 1999, which held the evidence admissible. Notably, defense counsel did not object to the lack of notice at the Prieur hearing held on August 5, 1999. Moreover, despite the late hearing about admission of the evidence at the guilt phase, defendant makes no showing how his strategy would have been different had he received notice earlier. Because defendant does not demonstrate prejudice resulting from the state's untimely filing, he shows no basis for relief under the notice requirements of Prieur and Sanders. Accordingly, defendant's claim concerning the state's purportedly insufficient notice that it would introduce the other crimes evidence does not warrant relief.
As to the substantive claims concerning introduction of the evidence, the court focused on the portion of the confession in which defendant claimed that he killed the victim after she confronted him and relied in part on State v. Kahey, 436 So.2d 475 (La.1983) to rule as follows:
Since the defendant intimates that he only hit and cut Mrs. Philippe after she attacked him he places his "intent to kill or inflict great bodily harm at issue." The evidence of the other crimes tends to shed the light on the doctrine of chances and repetition of instances on whether or not his actions as to Mrs. Philippe were "inadvertent, accidental, unintentional or without guilty knowledge." McCormick on Evidence, § 190 at 45 cited at page 487 of the Kahey case. It appears that the three (3) prerequisites of Kahey as to intent are satisfied. Knowledge, system modus operandi of the defendant are likewise present.
La. R.S. 15:445 provides that "in order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transactions." In Kahey, this Court explained that before other crimes evidence can be admitted as proof of intent, three prerequisites must be satisfied: (1) the prior acts must be similar; (2) there must be a real and genuine contested issue of intent at trial; and (3) the probative value of the evidence must outweigh its prejudicial effect. 436 So.2d at 488. See also State v. Williams, 96-1023, p. 30 (La.1998), 708 So.2d 703, 725-726 (evidence demonstrating that the defendant shot a man during a robbery just hours before the crime charged was admissible in a first-degree murder prosecution because evidence of the earlier shooting was relevant to show that the defendant intended to fire the gun *125 at the victim even though he claimed that the gun accidently went off); State v. Jackson, 625 So.2d 146, 150 (La.1993) ("[when] the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act was committed.").
Here, evidence that defendant killed or attempted to kill the occupants of several other residences during the commission of aggravated burglaries meets all the requirements of Kahey. First, the acts were similar, in that they each involved home invasions where defendant entered the home to steal money, was caught by the resident, each of whom were somewhat elderly, and then killed or attempted to kill the resident.
Second, specific intent was a genuine issue at trial, in that it is an essential element of the crime, and was contested. This evidence undermines that portion of his confession indicating that the altercation resulting in the victim's death occurred only after Mrs. Philippe struck him with a trophy as he attempted to exit the residence peacefully. Cf. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 197-98 (Evidence that defendant had prior rape conviction and had declared that "he wasn't going back to prison for nobody" admissible to show motive and specific intent to kill victim during perpetration of aggravated rape). However, despite his confession suggesting he acted in self-defense, defendant maintains that because he did not present evidence or argue at trial that he lacked specific intent, the state should not have been permitted to introduce the other crimes evidence to prove that element of first-degree murder. In so doing, he argues the state violated this Court's holding in State v. Martin, 377 So.2d 259, 263 (La.1979), that "the prosecution cannot credit the accused with fancy defenses in order to rebut them at the outset with some damning piece of evidence."[25]
The state possesses the burden to prove every element of the crime, including specific intent, beyond a reasonable doubt. That being the case, because defendant maintained that he acted in self-defense in his confession, the state was entitled to present evidence to the contrary in support of its case. In a somewhat analogous situation, in United States v. Leight, 818 F.2d 1297, (7th Cir.1987), the defendant was accused of a child's murder and claimed that the victim's death was accidental. The 7th Circuit Court of Appeals held that evidence regarding the defendant's physical abuse of other children in her care was admissible to prove that the victim's death resulted from physical abuse. Id. at 1303; cf. United States v. Brantley, 786 F.2d 1322, 1329 (7th Cir. 1986) (when a defendant is charged with a crime and specific intent is an essential element of that crime, the government may introduce evidence of prior or subsequent acts to establish the element of intent even if the defendant has not placed his intent into question).
Moreover, defendant's claim that he did not contest the issue of intent lacks a factual basis. In fact, the record reveals that in his closing, defense counsel strenuously *126 argued about the state's lack of evidence on the issue as follows:
There's insufficient evidence on the element of intent. The [d]efendant never said he intended to kill anyone. The evidence shows he never took a weapon with him to the residence, the Philippe residence. For that matter, to any of the residences. You heard the testimony today, the police officer himself said, "Well, he never took a weapon with him."
So that gives youthere's some physical evidence you can look at. There's some hard direct testimony from a police officer showing you that he did not have intent to kill. And that's real important, because that may save us several weeks.
* * *
You can't have your cake and . . . eat it, too. If they [the prosecution] want the confession, if they want to eat it, then they are going to have to eat it, because the officers themselves on there say, "You didn't intend to do this. I know you didn't intend to do it." There is no intent. "You didn't mean it." How many times did you hear that kind of testimony?
We find the other crimes evidence met the second requirement of Kahey.
As to the third element of Kahey, defendant argues that the court erred when it admitted proof of the five other murders and two attempted murders given their enormous prejudicial effect. In fact, the vast majority of the guilt phase of the trial involved the introduction of evidence of the unrelated murders, not limited to defendant's statement about the crimes but also including testimony from the victims' relatives and pathologists who provided information about the causes and manners of death.
In support, defendant points to State v. Morris, 362 So.2d 1379 (La.1978), in which this Court held that in a prosecution for the first-degree murder of the defendant's juvenile son, two prior crimes involving other children (the hitting of a child with intent to injure him in Texas and a Louisiana crime of unintentional killing) were inadmissible to prove intent because the prejudicial effect, "far outweighs whatever probative value it might have . . . especially if the state (as it indicates) intends to go into extensive details as to the circumstances of the previous offenses." Morris, 362 So.2d at 1382; but see Marcus, J., dissenting ("I consider that evidence of defendant's previous convictions for the aggravated assault on one child and manslaughter of another infant child would be admissible to show her intent to kill or to inflict great bodily harm on her victim child injured in this case."). Id. 362 So.2d at 1383. However, in Kahey, this Court held evidence of the serious mistreatment of 12 other children in defendants' home was admissible to prove intent.
Ultimately, however, even assuming that the court should have not admitted the voluminous evidence detailing all of the other murders, there is no reasonable possibility that admission of the evidence had any effect on the jury's guilty verdict and was thus harmless. See State v. Johnson, 94-1379, p. 15 (La.11/27/95), 664 So.2d 94, 101 (erroneous admission of other crimes evidence is subject to harmless-error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) standard).[26] At trial, *127 defendant was faced with the hard fact that he voluntarily confessed to five home-invasion murders in one statement. The State was entitled to present this evidence to show his intent to kill Mrs. Philippe. Assuming that jurors considered the evidence for the limited purpose of ascertaining defendant's intent during his fatal encounter with Mrs. Philippe as they were instructed, the fact that the state was able to present all five murders is no more prejudicial than if they had just presented proof of two or three, which they clearly would have been entitled to do.
Defendant's claims concerning the admission of other crimes evidence at the guilt phase do not warrant relief.[27]
IV. Defendant's claim that the trial court erred in: (1) preventing him from introducing the entirety of the custodial statement and the testimony of the officer who administered the polygraph; and (2) curtailing cross-examination concerning the tactics used to secure the confession.
In this argument, defendant claims that the court violated his right to confront witnesses and present a defense when it excised from his videotaped confession the entire portion in which he was interrogated by the officer who administered the polygraph examination, FBI Agent Sparks, and did not allow him to call Sparks as a witness.
After the trial court denied defendant's motion to suppress the other crimes evidence, which evidence was to be introduced *128 by way of the 12-hour confession, defendant sought to introduce the 12-hour confession in its entirety, including the portion of the interview conducted by Agent Sparks. However, the court ruled that the videotaped interrogation "can be shown to the jury for evaluation except that portion showing the polygraph examination" and that "[i]n accordance with State v. Arnold, 533 So.2d 1311 (La.App. 3 Cir.1988), any reference to the polygraph statements of the defendant are ordered excised . . ." The record reveals that defendant lodged an objection at trial concerning the court's ruling which prohibited the presentation of the portion of the videotape making any reference to the polygraph and eventually moved for a mistrial arguing:
The [s]tate did not play the tapes in their entirety in violation of 15:450. And as Your Honor knows, Title 15 requires that they be played or used in their entirety. That's one ground.
* * *
And then finally, also the defense was not allowed to call FBI Agent David Sparks who, as we all know, did administer the polygraph examination; but more so, we were not allowed to question him about information that he imparted to the [d]efendant giving specific facts in questioning him on the case.
The state responded that it could not examine Sparks because:
. . . he's a polygraphist or a polygraph examiner, there was no way the [s]tate could call him without letting the [j]ury know who he was. And the [c]ourt ruled that any reference to Mr. Sparks was not to be shown to the [j]ury. The burden is to prove, prior to the admission of the confession to the [j]ury, under 14:451, if I'm not mistaken, that the confession was free and voluntary and not made under the influence of any fear, duress, intimidation, menaces, threats, or inducements of [sic] promises. We believe we met that burden with the testimony of the officers that testified; and therefore, any particular objection should be overruled by the [d]efendant as it concerns that matter.
The court denied the defense motion for a mistrial, ruling as follows:
. . . All right, Motion for a Mistrial, 15:450, to be used in its entirety. As has been said many, many times, if you do have a confession and it does make reference to other inadmissible crimes, the defense has the option of saying, "Leave out the inadmissible crimes or do the whole thing in its entirety." There was an early decision by the defense, leave out the inadmissible crimes that didn't have to dothat didn't have to do with Attempted Murder or Murder, or something like that.[28]
So once that was done, then the question came up of the polygraph. The [c]ourt ruled the polygraph inadmissible and gave you reasons and a[c]ourt decision saying you can't even mention it. And because you can't mention it, I said that Sparks couldn't be called to testify. If you did call Sparks to testify, there was a great danger, "Who are you? Why are you there? What are you doing in this interrogation room?" The State v. Davis situation where you ask, "How do you know that the defendant, that this witness is telling the truth?" "Well, because I gave him a polygraph." Grounds for a mistrial. So, there was a great danger with Sparks, and the Court made that ruling.
*129 Defendant asserts that the court's ruling prevented him from presenting evidence to the jury concerning the most crucial portion of the interviewthe two and one-half hour period during which he was interrogated by FBI Agent Sparks which was excised from the videotape. While defendant concedes that admission of the results of the polygraph were inadmissible, see State v. Catanese, 368 So.2d 975, 981 (La.1979), and its progeny infra, he claims that the state successfully shielded the jury from reviewing the coercive circumstances precipitating his confession by having the examiner conduct the interrogation.
First, defendant maintains that the frequent references (and defendant's ultimate submission) to the polygraph would have, in and of themselves, demonstrated coercion to the jury and supported his claim that the confession was untrustworthy. See State v. Faller, 88 S.D. 685, 227 N.W.2d 433, 435 (1975) ("A defendant, when suddenly faced with the impersonal accuracy of a [polygraph] machine, may believe it is safer to confess and place himself at the mercy of the law rather than lie to the examiner and sacrifice any possibility of leniency.").
In addition, defendant claims Agent Sparks employed the most coercive techniques of four officers conducting the interview,[29] badgering him relentlessly until he confessed.[30] Moreover, defendant claims that the excised portion of the confession contains evidence of defendant's physical discomfort, including portions in which he expresses that he is tired, cold, and experiencing nicotine withdrawal, and in which he also vehemently maintains his innocence[31] and indicates *130 some confusion concerning his right to refuse the polygraph.[32]
Finally, defendant notes that during Sparks's interrogation, the agent provided details of Joan Brock's murder before defendant ultimately confessed to that crime.[33] Defendant maintains this information was critical to his defense because had it been available to jurors, they could have inferred that state agents had similarly provided him with details concerning the other murders, thereby undercutting the state's claim that, despite the lack of physical evidence connecting him to any of the crime scenes, defendant had to be the assailant because in his confession he provided details of the crimes which had not been made public.
A criminal defendant has the constitutional right to present a defense. U.S. Const. amends. 6 and 14; La. Const. art. 1, § 16; Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 201. A defendant should therefore be allowed to present evidence on any relevant matter. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1037. This right is not without limitation, and *131 unreliable evidence may be barred from criminal trials. Id.
This Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. Consistent with this view, the Court has "made it clear" the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." State v. Hocum, 456 So.2d 602, 604 (La.1984); State v. Tonubee, 420 So.2d 126, 132 (La.1982); State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Cantanese, supra at 981. Moreover, this Court has held that polygraph information and test results are inadmissible "`either as substantive evidence or as relating to the credibility of a party or witness.'" State v. Humphrey, 445 So.2d 1155, 1158 (La.1984) (quoting State v. Tonubbee, supra at 132). The principle reasons such evidence is inadmissible are its lack of probative value, insufficient scientific reliability, and its potential for an unduly prejudicial effect on lay jurors. State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, 35.
In addition to implicating the rule that polygraph evidence is inadmissible in criminal trials, this case also involves the application of defendant's statutory rights pursuant to La. R.S. 15:450 and La.C.Cr.P. art. 703(G). La. R.S. 15:450 provides that "[e]very confession, admission or declaration sought to be used against anyone must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." La.C.Cr.P. art. 703(G) states in part that "[a] ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making on the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement."
This Court has stated that La. R.S. 15:450 allows a defendant to insist upon the introduction of the entirety of a statement sought to be used against him, but his protection may be waived. State v. Haynes, 291 So.2d 771, 772 (La.1974).[34] We have stated defendant's options under La. R.S. 15:450 in the context of an issue of other crimes evidence as follows:
[W]hen the state seeks to introduce a confession, admission or declaration against a defendant which contains other crimes evidence, but which is otherwise fully admissible, the defendant has two options. He may waive his right to have the whole statement used, object to the other crimes evidence, and require the court to excise it before admitting the statement; or, he may insist on his right to have the statement used in its entirety so as to receive any exculpation or explanation that the whole statement may afford. A third alternative, that of *132 keeping the whole statement out, is not available to defendant, unless of course, the confession is not admissible.
State v. Morris, 429 So.2d 111, 121 (La. 1983); see also State v. Snedecor, 294 So.2d 207, 210 (La.1974); State v. Green, 443 So.2d 531 (La.1983), (rejecting the defendant's claim that the court should have excluded his inculpatory statement in its entirety because it contained other crimes references and the statement had been made following the administration of a polygraph examination because he could have chosen to have the statement admitted in its entirety).[35]
In the instant case, defendant sought to exercise his right under La. R.S. 15:450 to have his statement used in its entirety in order to show that his confession was coerced and involuntary.[36] Based on the totality of the circumstances, we find that the trial court abused its discretion when it prevented the jury from viewing the interrogation of defendant by Agent Sparks over defendant's objections.
In addition to letting the jury view the Sparks' portion of the interrogation, the trial court should also have permitted defendant to examine Agent Sparks at trial. Defendant has a right to introduce evidence regarding the circumstances leading to his confession to enable the jury to determine the weight to be given the confession. La.C.Cr.P. art. 703(G); see also State v. Van Winkle, supra at 203 ("Ms. Van Winkle argues that the [d]istrict [c]ourt erred in prohibiting her from presenting evidence as to her mental state when she gave the various statements . . . If . . . the statements are used, then the defendant is entitled to introduce `evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given to the confession or statement.'") (quoting La. *133 C.Cr.P. art. 703(G)); see also Crane v. Kentucky, supra, 476 U.S. at 689, 106 S.Ct. at 2146 ("[R]egardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubts on its credibility."); State v. Williams, 01-1650, p. 8 (La.11/1/02), 831 So.2d 835, 843 (Statutory rule of La.C.Cr.P. art. 703(A) which permits the defendant to introduce evidence at trial as to the circumstances surrounding his confession "has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court made in ruling on the voluntariness of the statement as a matter of law.")
Given the statutory and constitutional guarantees that entitle a defendant to present evidence in support of a claim of that his confession is unreliable as a result of coercive interrogation techniques, the trial court erred in excluding the entirety of Agent Spark's interrogation of defendant and in prohibiting defendant from calling him as a witness.
That being said, the erroneous exclusion of this evidence is subject to the harmless error standard of review. In Crane, supra, a capital case in which the defendant's entire defense was that there was no physical evidence to link him to the crimes and that, for a variety of reasons, his earlier admission of guilt was not to be believed, the United States Supreme Court found the erroneous exclusion of defendant's testimony regarding the circumstances of his confession fell under harmless error review standards. See also, State v. Vaughn, 431 So.2d 358, 361-62 (La.1983) (on rehearing) (erroneous exclusion of evidence subject to harmless error analysis). As this Court explained in State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 377, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), an error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.
After careful review of the entire transcript of the 12-hour interrogation, including the portion where defendant was interrogated by Agent Sparks, and the videotaped version in the record, we find nothing to support defendant's argument that had the jury seen the Sparks interrogation, they would have concluded that defendant's statement was coerced. The record reflects that of the 194 page verbatim transcript of the entire interrogation, the Sparks' portion is only 35 pages long, from page 61 through page 96. Most of the interrogation, 25 of the 35 pages, consisted of Sparks' straightforward explanation of the polygraph system and of the eight exact questions he would ask during the polygraph, which he went over three times before the polygraph was even given. It was not until the polygraph was concluded at page 85 that Sparks first attempted to convince defendant to confess to the crimes, telling him that he did not think he was the kind of person to do these types of things, that something in him must have "snapped," and that his family was still going to love him if he confessed. Sparks also told him that the investigation pointed to him as the right suspect, that they knew he did it, and that he "wouldn't be sitting here talking to [him] if [he] passed the polygraph." Contrary to defendant's claims, we do not find that Sparks' "badgered him relentlessly." Had the jury heard the Sparks' portion of the interview, either with or without the polygraph portion edited out, they would *134 have found nothing to lead them to believe Sparks coerced defendant into confessing.[37] Further, while they would have *135 heard defendant did tell Sparks he was tired once and cold three times, he never asked to stop the interrogation because of this. Further, Sparks assured him he would turn the heater on and evidently he did, because the third time defendant complained about being cold, defendant said they "must have turned that heater off again." While he complained of nicotine withdrawal before the Sparks interview, he only asked to smoke once during the Sparks' interview and he was eventually allowed to smoke. Finally, while he did consistently deny his involvement in the murders to Spark, we fail to see how this would have led the jury to disregard his subsequent lengthy and detailed confessions to the crimes.
Further, after reviewing the videotape of Detective Hymel's interview of defendant immediately after Sparks had finished, it appears that the major precipitating factor in obtaining the confessions was not Spark's interview, but was instead Hymel's lengthy and emotional appeal to defendant to confess. For 20 uninterrupted minutes, Hymel calmly urged defendant to confess, mostly by referencing defendant's recently deceased mother. Hymel told him that he thought his mother's death had deeply affected him, that his mother would want him to confess, that he knew he really did not mean to hurt anyone, and that God and his mother would forgive him. While defendant consistently denied any involvement in the face of Sparks' polygraph and subsequent questioning, after this long appeal from Hymel, defendant instantly broke down and confessed.
In addition, we reject defendant's argument that had the jury seen the Sparks' interview, they would have inferred that the other officers must have given defendant information about the crimes outside the view of the videotape. While the record reflects that while Sparks did tell defendant some details of the Brock homicide that were not public knowledge, Sparks did not give defendant any information about the other crimes. Defendant's confession revealed other details that were not disclosed by Sparks about the Brock murder, and even provided a motive for the Brock killing that the officers were unaware of.[38] Further, he gave details *136 about the other crimes and were not public knowledge and that clearly Sparks did not give him. In addition, the officers testified that they did not give defendant any information about the other crimes, including the Phillipe murder, out of the view of the video camera, and this testimony was uncontradicted. That being the case, defendant's claim that presentation of the evidence would have supported his contention that the state provided him with information about the Philippe murder is unfounded.
Accordingly, this argument lacks merit.

SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR) and Capital Sentence Investigation Report (CSI), as La.S.Ct.R. 28 § 3(b) requires. In addition, the state has filed a sentencing memorandum and defendant has filed an opposition thereto.
These documents reveal that defendant, Daniel Joseph Blank, was 34 years old when he committed the instant offense. Defendant was born in Lutcher, Louisiana, to the legal union of Alice and Hypolite Clark. Defendant's mother died in 1994 and his father testified at the sentencing hearing. Defendant has either four or five brothers[39] and two sisters, and three of his siblings testified on his behalf at the penalty phase. Penalty phase testimony from his relatives demonstrated that defendant had a very close relationship with his mother and had difficulty coping with her death. Defendant is divorced and has two children, a 19-year-old son and a 13-year-old daughter. Although the UCSR indicates that defendant was not supporting his children at the time of the offense, his son testified and stated that his father had "mostly" raised him. He also described defendant as "very compassionate" and an "excellent father." At the time of the crimes, defendant lived with his girlfriend, Cynthia Bellard, and her two children, both of whom he supported. Bellard was originally charged with first-degree murder but the state granted her immunity in exchange for her testimony. Ultimately, however, she did not appear at either phase of the trial.
Defendant dropped out of high school after the eighth grade. Although the CSI *137 states that "[t]he subject attended no Vo-Tech or GED classes," defendant's father testified that he went to trade school. In any event, all the evidence suggested that defendant began his automotive and mechanical career immediately after quitting his formal education. Before his arrest, defendant maintained steady employment as an auto mechanic and had previously been employed by one of his victims, Victor Rossi, and by the husband of another victim, Joan Brock.
The UCSR estimates defendant's I.Q. in the medium range (between 70 and 100). Dr. Milton Rhea testified at the penalty phase that the results of a Minnesota Multiphasic Personality Inventory ("MMPI") suggested that defendant suffered from "schizophrenia, chronic paranoid type" and/or a "schizoaffective disorder." Dr. Ronald Goebel diagnosed defendant with a brain abnormality resulting in deficits in abstract reasoning.
Defendant's criminal history before the instant offense was minimal. As noted above, he was apparently adjudicated delinquent of simple arson as a juvenile in 1976. He also has a juvenile arrest for simple battery and an adult arrest for criminal mischief, but both charges were dismissed. The only other offenses present on his adult record are those for traffic violations. At the time of the instant conviction, four other first-degree murder cases were pending against defendant. Since that time, a jury convicted defendant and sentenced him to death for the murder of Joan Brock. That case is pending on appeal in this Court. In addition, defendant pled guilty to second-degree murder for the killing of Barbara Bourgeois and to two counts of first-degree murder for the killings of Sam and Louella Arcuri. On these three counts, defendant received sentences of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
Defendant denied any history of alcohol or substance abuse. While there existed no evidence of any chemical dependency, the state's investigation of the murders suggested that at the very least, defendant attempted to launder the proceeds from the robberies at local casinos. The UCSR states flatly that defendant committed the crime to "to feed [his] gambling habit."
Defendant declined to give a statement to the officer conducting the CSI, claiming that he had given his attorney a "statement in writing and wanted that statement to stand." For his part, defendant's trial attorney stated that "[a]ny information that I may provide in the capital sentencing report could possibly be used by prosecutors against my client in the next capital case."

Passion, Prejudice or Other Arbitrary Factors.
The record reveals no indicia of passion, prejudice or arbitrariness. Race was not a factor in the proceedings. Defendant and the victim were both Caucasian. Due to the extensive publicity, the court moved the trial to Terrebonne Parish. Defendant's claims that the court should have granted his second and third motions for a change of venue as a result of publicity concerning another capital case in Terrebonne Parish have been discussed in the appendix and do not warrant relief.

Aggravating Circumstances
The state presented constitutionally sufficient evidence to demonstrate that the victim was over the age of 65 and that at the time of the commission of the offense, the offender was engaged in the perpetration *138 of an aggravated burglary.[40]

Proportionality
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The state's Capital Sentence Review Memorandum reveals that since 1976, grand juries in Assumption Parish, Ascension Parish, and St. James Parish, the three parishes that make up the 23rd Judicial District Court, have returned indictments charging 62 individuals with first-degree murder, including the current case. Of these 62, the state's sentencing memorandum advises that 34 of the cases originated in Ascension Parish and that a jury has returned a verdict of death in only one other case.
The state reports that on March 10, 1999, Shon Miller shot and killed his mother-in-law, forced two of his friends to drive him to a nearby church, then ordered one to go inside and get his wife. The friend got to the steps of the church and collapsed, at which time the defendant allowed his other companion to render aid. The pair entered the church and called 911. The defendant soon followed, shot twice into the church ceiling and shouted to the praying congregation, "Nobody move!" The defendant walked straight to his wife and shot the man sitting next to her once in the head, killing him. The defendant's two-year-old son called out happily to his father, and the defendant shot and killed him as well. Finally, the defendant unloaded his pistol into his wife, killing her. An Ascension Parish jury found Miller guilty of first-degree murder and recommended a sentence of death. Miller's appeal is pending in this Court under docket number 05-KA-1826.
Furthermore, two of the 17 Assumption Parish first degree murder indictments have resulted in death sentences. In the cases of James Dunn and co-defendant Anthony D. Scott, both men entered the Iberville bank in Napoleonville, brandished guns, forced two tellers into a side office and shot them several times in the head and upper body. The two men and their accomplice Kendall Breaux, fled the bank with more than $16,000. Police apprehended the men after they ran a nearby roadblock and their vehicle was hit by a train. Breaux pled guilty to two counts of first-degree murder, and the court imposed consecutive life sentences in accord with the plea agreement. Dunn and Scott *139 were both convicted of first-degree murder, and the trial court sentenced both men to death pursuant to the recommendations of their respective juries. Dunn appealed, and this Court remanded the matter for additional proceedings in light of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). State v. Dunn, 01-1635 (La.11/1/02), 831 So.2d 862. This Court affirmed Scott's conviction and also remanded the case to the trial court to determine whether Scott is mentally retarded and thus ineligible for the death penalty. State v. Scott, 04-1312 (La.1/19/06), 921 So.2d 904.
Finally, of the 11 capital cases originating in St. James Parish, one resulted in a death sentence. Glynn Juniors was convicted of first degree murder on June 22, 2000. Evidence demonstrated Juniors and his co-defendant, Ronald Williams, drove to an office building in Convent to commit an armed robbery. Juniors entered the building, robbed the business, and shot the two employees. Williams acted as lookout and drove the getaway car. When Juniors exited with the cash, he told Williams that he put a bullet in both of the victims' heads. One victim died, but the other survived. This Court affirmed the conviction and sentence. State v. Juniors, supra.
Furthermore a state-wide review reveals that juries often return the death penalty in first-degree murder cases which involve the killing of elderly victims during the course of an aggravated burglary. See State v. Howard, 98-0064 (La.2/23/99), 751 So.2d 783 (defendant and several others savagely beat and stabbed 82-year-old female victim in her home); State v. Robertson, supra, 712 So.2d 8 (defendant savagely stabbed an elderly couple to death during robbery in their home; victims were 76 and 71); State v. Tart, 92-0772 (La.2/9/96), 672 So.2d 116 (La.1996) (defendant bound and repeatedly stabbed elderly couple to death during robbery in their home; victims were 70 and 66); State v. Burrell, supra (defendant shot couple, age 65 and 56, in their home during an armed robbery); State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La.1984) (same; co-defendant of Wingo); State v. Celestine, 443 So.2d 1091 (La.1983) (defendant strangled an 81-year-old woman in her home during an aggravated rape); State v. Narcisse, 426 So.2d 118 (La.1983) (defendant repeatedly stabbed a 74-year-old woman during an armed robbery in her home).
Compared to these cases, even in the absence of the evidence demonstrating that defendant committed five unrelated murders, it cannot be said that the death sentence in this case is disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant *140 to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
CALOGERO, C.J., dissents for reasons assigned by KIMBALL, J.
KIMBALL, J., dissents and assigns reasons.
KIMBALL, Justice, dissents.
I agree with the majority's conclusions that the trial court abused its discretion when it prevented the jury from viewing the interrogation of defendant by Agent Sparks over defendant's objections and when it prohibited defendant from examining Agent Sparks at trial. I disagree, however, with its determination that these errors were harmless. In my view, it cannot be said beyond a reasonable doubt that the excluded evidence could not have affected the jury's verdict. Consequently, I would reverse defendant's conviction and sentence.
The record reveals that Agent Sparks's portion of the interrogation was, in fact, relevant to establishing defendant's defense theory. The examination by Agent Sparks was not merely incidental or supplemental to the entire 12-hour interrogation. It appears to have been an integral portion of the interview, and defendant's confessions of the crimes occurred shortly after Agent Sparks's interrogation. Exclusion of this portion of defendant's statement did not allow the jury to get a feel for the entire tenor and context of his confession, which was relevant to its determination of the voluntariness and reliability of his words.
A reviewing court must find beyond a reasonable doubt that excluded evidence could not have affected the jury's verdict for the error to be harmless. State v. Everidge, 96-2647, p. 8 (La.12/2/97), 702 So.2d 680, 685. When an appellate court determines the excluded testimony is crucial to the defense theory, a conclusion of reversible error is well-founded. Id.
Considering the totality of the circumstances presented by this case, I cannot say beyond a reasonable doubt that the excluded evidence could not have affected the jury's verdict. The State largely relied upon defendant's confession to prove his guilt. Given that the State failed to present any forensic proof connecting defendant to the crime scenes, any evidence tending to undermine the veracity of his confession would certainly have been useful to the defense. The defense attempted to show the coercive nature of the whole interrogation in order to prove defendant's confession was not trustworthy. It is conceivable that viewing Agent Sparks's portion of the interrogation, along with his testimony, may have planted reasonable doubt in the minds of the jury. Accordingly, I do not believe the trial court's errors were harmless.
NOTES
[1] Included in this investigation were the following home-invasion crimes: the October 27, 1996 murder of Victor Rossi in Ascension Parish; the May 9, 1997 murders of Mr. and Mrs. Sam Arcuri in St. John the Baptist Parish; the May 14, 1997 murder of Joan Brock in St. John the Baptist Parish; the May 18, 1997 murder of Barbara Bourgeois in St. James Parish; and the July 6, 1997 armed robbery and attempted murder of Leonce and Joyce Millet in Ascension Parish.
[2] In its appeal to the public, the task force stated that the suspect may have "purchase[d] a vehicle or other items which would normally not be affordable for this person, or [there might exist] some other indication of a recent influx of money."
[3] The jury heard defendant's detailed confessions to the murders of Mr. Rossi, Mrs. Brock, Mr. and Mrs. Acuri, and Mrs. Bourgeois, and to the attempted murders of Mr. and Mrs. Millet.
[4] After discussing his unauthorized entry through the roof of the victim's residence during his interrogation by Detective Toney, defendant described the confrontation that led to his killing of Mrs. Philippe as follows:

DB:. . . . Then I went back in and turned the light back on and started looking some more. And I didn't find anything so I gave up on it andand when I come out I had turned the light off and when I come out that's when I saw something swinging at me.
MT: You saw something swinging at you.
DB: Well, I saw a shadow of something, the light was off, the only light on was I think the bathroom light. And uh when I saw something coming at me with the shadow of the bathroom light andand uh just put my arm up and then I grabbed it and uh pushed her. And uh.
MT: When you say you saw this something swinging at you was it a person?
DB: Yeah, it was the woman swinging something at me I don't know if it was [a] lamp uh, I didn't see it I just grabbed it. And it could have been a lamp, it could have been a trophy, it kind of felt more like a trophy II don't know it could have been one of them little skinny lamps, I don't know. And uh, well that's when I pushed herpushed her and uh and then she comes at me, with uh I don't know if it was a knife or one of them letter openers or something I don't remember what it was I didn't see it.
MT: She had it in her hand?
DB: Yeah that's when I hit her with the thing I had in my hand. And then I grabbed it and uh I cut her with the knife, I don't remember where I cut her at or how I did it. It just happened so fast I justI just freaked out and then I then I left after that.
MT: Alright. So you're saying while you was in the closet you heard some noise and you turned the light out in the closet.
DB: Right.
MT: And then you waited a little while and you turned the light back on.
DB: No, II turned the light off when I heard a noise and then I kind of opened the closet door and pe[e]ked out. And I didn't see anything or didn't hear anything. And I waited a couple of seconds and then I closed the door back and turned the light back on. And uh then when I was ready to get out after I had looked around and uh, they had all kind of stuff in there I kind of emptied the drawers out and stuff like that and didn't find nothing. I just decided to leave.
MT: Okay.
DB: And then when I come out that's when, when I turned the light off and opened the door and come out that's when she was standing there and uh she had something in her hand and swung it at me.
MT: And you took it away from her?
DB: I put, you know, my hand up like that and it hit me on the arm. And then I grabbed it, pushed her on back onto the bed. And then she grabbed something off of the table or something, coffee table and it could have been a knife or could have been one of them letter openers, I don't remember.
MT: Okay so when she went to grab this you had this trophy.
DB: She come up.
MT: Or lamp in your hand.
DB: Yeah, she come up and all I seen was a, like a shadow, because I there wasn't no light where she was the light was where I was shining from the bathroom. And the bathroom door wasn't all the way open it was kind of cracked. And uh well then she come back at me with the knife and uh, I tried to grab it but I couldn't see herher arm to grab it. And I just kind of ducked to the side and I hit her with the thing that I had in my hand.
MT: What part of theher body did you hit her?
DB: I think I hit her in the head, I ain't sure.
MT: Okay.
DB: I think that's where I hit her.
MT: And what did she do?
DB: And after that II pushed her and uh then I grabbed her hand with the knife and I know I cut her, I don't know where. But uh.
MT: Was she standing up when you cut her? Or.
DB: No, she was laying on the, I think she had when I pushed her she was laying across the bed or at the edge of the bed. Uh, and after Iafter I did that then I then I left.
MT: But you hit her with the knife, too then.
DB: Yeah.
MT: Okay and then you left.
DB: I uhII grabbed her arm or hand or something and went back with it and then II took the knife and uh I ain't positive, but I think I hit her twice with it. I ain't sure I don't remember it happened so fast. Uh, I was just scared and II just took out and left.
MT: You tookyou took out and left or took her out?
DB: No, I took off. I got out of there.
[5] In addition to the videotaped confession, the jury heard testimony from police officers that the details of the crime scene matched defendant's confession, that defendant was identified from the composite sketch released subsequent to the July 6, 1997 attempted murder and armed robbery of the Millets, that they found a bent pair of needle-nosed pliers in defendant's auto shop matching those defendant said he used to cut the phone wires at several of the residences, and that several of the details confessed to were not public knowledge, such as the location of the attic ladder, the location of the safe in the closet, the location of the purse and its contents, and the location of victim's body. Further, during the videotaped confession, the jury heard evidence of the significant amount of money defendant was gambling at the casinos and the significant amount of money defendant was spending on vehicles and other items, all of which was way out of line with defendant's actual income.
[6] The videotaped confession revealed that both Victor Rossi and Joan Brock's husband were his previous employers, that Barbara Bourgeois lived across the street from his father, that he purchased auto parts from Lillian Phillipe's husband, and that the Acuris lived across the street from Airline Motors where his girlfriend worked for some time.
[7] In relation to Victor Rossi, defendant stated that Rossi failed to pay him for some fuel injection equipment and failed to pay him for work he had performed; in relation to Joan Brock, defendant stated that Doug Brock took advantage of him by not assisting him in building some street rods; in relation to the Millets, defendant stated that because they had a "big old fancy house," he thought they would have cash inside.
[8] All assignments of error not discussed in this Opinion are discussed in an Unpublished Appendix to this Opinion.
[9] Over defense objection, the trial court excised those portions of the interrogation which involved any references to the administration of the polygraph examination. Exclusion of this evidence is discussed infra.
[10] This Court considers the entire record when passing on the correctness of a suppression ruling. State v. Green, 94-0887, p. 11 (La. 5/22/95), 655 So.2d 272, 280; State v. Brooks, 92-3331, p. 10 (La. 1/17/95), 648 So.2d 366, 372; State v. Martin, 595 So.2d 592, 596 (La. 1992); State v. Seward, 509 So.2d 413, 416, n. 8 (La. 1987).
[11] After discussing defendant's education, family, work history, recent purchases and casino winnings, Officers Mike Toney and Todd Hymel engaged defendant in the following exchange:

MT: Do you have any idea why we're here?
DB: Un-un.
TH: Do you think we traveled this distance to speak to you about casino winnings, dodo you think legitimately that's why we're here?
DB: Well basically you wanted to know where I got all my money from you know and that's why I gave him the papers [documenting money won at the casino].
TH: Wewe went ah we bothboth of us took a good number of notes and we been speaking to you for about a hour and a half now.
DB: Um-huh.
TH: Every single question that we asked you we knew the answer to and we do that for one reason, to see if you're going to lie to us.
DB: Right.
TH: Therethere is [sic] a few points that you did and there is [sic] a few things that you did with hold [sic] from us. Ah we're not going to ask you a question that we don't know the answer to.
DB: Yeah.
TH: We been doing this for too long and we're good at what we do.
DB: Right.
TH: And we're not going to come here half steppin and I'm not going to travel five hours and come speak to you without having all my ducks in a row.
DB: Right.
TH: Okay. You have absolutely no idea why we're here to speak to me [sic], is that what you'reyou're telling us?
DB: Well you want to know where I got my money from.
TH: Have you ever been questioned or spoken to by any other Sheriff's Office in the past for any other crimes that had taken place?
DB: Ah I was called in on ah that deal about ah Rossi.
TH: The Rossi homicide?
DB: Yeah.
[12] It is unclear at exactly what point defendant's presence at the sheriff's substation turned from a voluntary interview into a custodial interrogation. Although defendant agreed to take a polygraph examination concerning his participation in the homicides after about three hours of questioning, he later expressed reluctance to submit to the test and engaged in the following exchange with Detectives Hymel and Toney:

DB: Now, like I said, if I refuse [the polygraph], then what happens?
TH: Daniel if you refuse it we got some serious talking we need to do okay.
MT: We'll sit down and talk to you some more.
TH: I'm noI'm not gonna bullshit you, we allwe all big boys in this room okay. Um but I think you should save that decision until uh until he [the polygraph examiner] gets here and he can explain the test to you and it's procedures, okay.
Given the officers' statements at this point in the interview suggesting that they would continue to interrogate defendant even if he refused the polygraph examination, arguably, at least, defendant's detention was no longer voluntary. Nonetheless, defendant ultimately agreed to the polygraph, waiving his Miranda rights immediately beforehand. Moreover, even after defendant had taken the polygraph and had been interrogated forcefully for approximately two hours by FBI Agent David Sparks, he asked the officer, "Want to charge me for this?" Given this latter inquiry several hours into the interview, tacitly acknowledging that he had not been charged with a crime, it appears unclear whether defendant believed he was free to leave.
[13] The Fifth Circuit conducted a thorough examination of these allegations (and that defendant was denied food during the interrogation) in State v. Blank, 01-0564 (La.App. 5 Cir. 11/27/01), 804 So.2d 132, in which defendant challenged the admissibility of the instant confession following his second degree murder conviction for the killing of Barbara Bourgeois. Reviewing the evidence as it related to defendant's claims concerning hunger, lack of sleep, nicotine deprivation, and the state's references to his deceased mother, the Fifth Circuit found the following:

Food
The record indicates that Blank did not ask for any food during the entire interview on November 13, 1997; he also did not indicate that he was hungry. In the transcript of the hearing on the motion to suppress before the Twenty-Third Judicial District Court, Detective Hymel testified that during the November 13 interview, Blank did not ask for any food, and had he requested food, he would have received it.
The detectives offered Blank something to drink on several occasions. Detective Hymel testified that he reviewed the taped interview several times and stated that Blank was provided five drinksfour Cokes and one cup of water. The twelve and one-half hour video of the interview is the best evidence to determine whether the confession was induced from lack of food. Upon review of the tapes, there appears no indication that Blank's confession resulted from lack of food. There was no express statement or mention of food by either the detectives or Blank. The detectives did not promise to give Blank food if he confessed. Further, the detectives did not eat in front of him, and Detective Toney stated that neither he nor Detective Hymel ate anything during the time frame of the interview. In light of the fact that the detectives provided Blank with drinks, bathroom breaks, and adjusted the temperature in the interview room, there is nothing in the record to suggest that Blank would have been denied food upon request. In light of the totality of the circumstances, there appears to be no coercion by the detectives to induce a confession from lack of food.
Cigarettes
Blank tried to smoke a cigarette in the interview room; however, Detective Hymel informed him that he could not smoke in the building. Detective Hymel testified that at approximately 3:45 p.m., which was two hours and forty-five minutes into the interview, Blank lit up a cigarette for fifteen seconds while he was not in the room. When Detective Hymel returned to the interview room, he informed Blank that he could not smoke in the building and directed him to put out the cigarette, explaining that there was a "no smoking" sign posted on the door. Detective Hymel also stated that shortly thereafter, at around 4:10 p.m., right before the polygraph test was to be administered, Blank had a 12-minute break where he went to the bathroom. Detective Hymel testified that Blank smoked a cigarette while in the bathroom. Detective Hymel stated that after Blank smoked in the bathroom, the detectives continued to let him smoke. Detective Hymel also stated that Blank smoked a cigarette nine times on camera and one time off camera, in the bathroom. Detective Mike Toney, the other officer present in the interview room, also testified that Blank smoked a cigarette prior to confessing.
A review of the record indicates that Blank did smoke prior to admitting some involvement in the crimes. Both Detective Hymel and Toney testified that at first, Blank was not allowed to smoke because of the "no smoking" sign. Based on the record and their testimony, it appears that the initial denial of the Blank's request to smoke was not because of police coercion but due to the no smoking regulation at the Texas courthouse. However, Detective Hymel stated that once Blank smoked in the bathroom, they allowed him to smoke in the interview room.
Sleep
Within the first three hours of the interview, Blank indicated that he was sleepy when he stated, "Sitting here ain't doing nothing, getting sleepy." Before the polygraph test was administered, Blank stated to David Sparks, the polygraph examiner, that he went to bed the previous night between 12:00 a.m. and 1:30 a.m. and woke up the next morning around 8:10 a.m. Blank also stated that he was up late working on a transmission. A review of the tapes also indicates that Blank put his head on the table when the officers were out of the room. The issue is whether Blank was deprived of sleep and, if so, whether this amounted to police misconduct which induced an involuntary confession. Based on the record, it appears that Blank did not request any sleep, only that he was tired from not doing anything and from working late on a transmission. The detectives did not promise Blank that they would allow him to sleep if he confessed. The record indicates that Blank had seven to eight hours of sleep the night before. Also, Blank was up the previous night to 1:00 a.m. which is around the time the interview ended in this case.
In light of the foregoing, it appears that the detectives did not deprive Blank of sleep as he claims. Detective Hymel testified that Blank was allowed 14 breaks throughout the 12-hour interrogation. Blank was appraised of his rights, including the right to remain silent and that he could stop the questioning at anytime. In this case, Blank did not invoke the right to remain silent, and at no point did he state that he wanted to stop the interview because he wanted sleep.
Mention of deceased mother
Blank alleges that the detectives coerced him into confessing by the repeated mention of his deceased mother. During the interview, the detectives explained to Blank that his deceased mother would want him to take responsibility and admit to the crimes. At that point, Blank broke down and began to cry. Thereafter, he admitted to his involvement in the crimes. A confession is not rendered inadmissible because officers exhort or adjure an accused to tell the truth, provided the exhortation is not accompanied by an inducement in the nature of a threat or which implies a promise of reward. In this case, the repeated references to Blank's deceased mother and the exhortation to tell the truth and take responsibility for his actions did not make the confession inadmissible. The detectives did not threaten or promise Blank anything in reference to his mother in obtaining the confession.
State v. Blank, 01-0564, pp. 7-10, 804 So.2d 132, 137-39 (footnotes omitted). The court of appeal accurately described the circumstances of the interrogation as depicted in the videotape and reached the correct result.
[14] For instance, FBI Agent Sparks engaged in the following exchange with defendant following the administration of the polygraph examination:

DS: You bet it is okay. But something occurred and you decided you wanted more in your life, you thought you could take the easy way, thought you could go get some money from somebody.
DB: No.
DS: And something happened.
DB: Un-un.
DS: And when you went into there [Joan Brock's residence]when you went in there, oh don't shake your head, II you know don't deny it okay-okay. The investigationthis investigation has been going on for six months son okay, this didn't happen yesterday, we just don't come down here out of the middle of no where [sic] okay, we know what's going on. What we're trying to figure out is why, because why this occurred okay.
DB: I don't know.
DS: I want you to tell meDaniel don't sit there and shake your head, now come on let's be honest with each other okay, let's be honest with each other [sic]. It's time to have a meeting of the minds okay, its [sic] time for you to sit down and accept what you've doneaccept what you've done and let it go okay.
DB: How can I accept something I ain't done.
DS: Yeahyeah but you have, yes you did okay. And Iand Iwhen youwhen you say you can't accept something you haven't done that's good okay, because that means in reality you [sic] going I can't accept I didn't do it because I did do okay, that's what you're trying to tell me alright, in your ownin your own street wise [sic] way that's what you [sic] trying to tell me alright. Something happened, something occurred in your life 16 months18 months ago, something made you snap all the way to here. I don't think it was drugs, I think it was something you said I have to take care of my family I have to take care of my family now, the time is come for me to take care of my family okay. You decided that you would take the easy way out, you didn't plan on hurting anybody, did you, no.
[15] In Seibert, the defendant was arrested for her participation in an arson-murder. Upon her arrest, officers questioned her without Miranda warnings for 30-40 minutes, gave her a 20-minute cigarette and coffee break, and then read Miranda warnings, after which officers interrogated her about her pre-Miranda statements. The officer admitted that he had made a "conscious decision" to withhold Miranda warnings initially, using an interrogation technique he had been taught. In these circumstances, the Court held that the purpose of the interrogation technique was to render Miranda ineffective by waiting to give the warnings until a confession was obtained and that it was unreasonable to treat the two sessions of "integrated and proximately conducted questioning" as independent interrogations. The Court thereby distinguished and limited its earlier decision in Oregon v. Elstad, supra, which held that an initial statement taken in violation of Miranda did not taint a subsequent statement taken in full compliance with Miranda. In his dissent, Brennan's bitter denunciation of the majority's "marble palace" psychology and his prediction that the majority invited police to employ a "question first" technique to break down a suspect's initial reluctance to give a statement, Elstad, 470 U.S. at 328, 332, 105 S.Ct. at 1303-1305 (Brennan, J., dissenting), anticipated the decision in Seibert.
[16] Despite defendant's appellate claim about the impossibility of entry into Mrs. Philippe's residence in the manner described in his confession, forensic scientist George Schiro testified only that the hole in the roof was fairly narrow and that it would have been "very difficult" for someone to have made entry through it. Schiro also testified that Schiro could not fit through it with a motorcycle helmet on. Notably, however, at 5'2?2D and 120 pounds, defendant would have likely had an easier time fitting through the hole than would an average-sized male intruder. Further, the jury also heard testimony that the police officers found a fresh blade of grass in the attic, indicating that someone had recently entered the attic from the outdoors.
[17] Regarding the motion to suppress, defendant also claims that the court should have admitted a booklet prepared by Dr. Mark Vigen offered to provide an analysis "about how to conceptualize [the confession] and how to understand it from a psychological point of view" and considered testimony provided by the witness on the issue of voluntariness. The court excluded the proffered booklet on hearsay grounds and ultimately discounted Vigen's testimony in its entirety, noting that it did not satisfy the standards set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) for the admissibility of expert scientific testimony.

Given that the witness's prepared booklet was not subject to cross-examination, defendant fails to show that the court erred when it excluded it on hearsay grounds. La.C.E. art. 801; La.C.E. art. 802. Moreover, given that Dr. Vigen himself could not cite to a "single scientific publication" to support his conclusions that the methods employed and questions posed by the officers were likely to produce a coerced or otherwise involuntary confession, he cannot show that the court erred when it discounted the testimony provided by the expert to that effect. This claim lacks merit.
[18] The "substantial impairment" standard applies to reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id., 112 S.Ct. at 2229. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause.
[19] The rule is different at the federal level. See United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (exhaustion of peremptory challenges does not trigger automatic presumption of prejudice arising from district court's erroneous denial of a cause challenge). At the federal level, a defendant may choose whether to exercise a peremptory challenge to cure the trial court's error, or to seat the juror and then raise the error on appeal if convicted. Martinez-Salazar, 528 U.S. at 315, 120 S.Ct. at 781.
[20] Justice Lemmon, writing for a majority of this Court in State v. Miller, 99-0192, p. 8 (La. 9/6/00), 776 So.2d 396, summarized the import of Divers, Maxie, Robertson, and Ross, as follows:

In each of these cases, while the prospective jurors stated a willingness, in the abstract, to consider a life sentence, defense counsel established the jurors' unwillingness or inability, because of the aggravating factors in the particular case, to follow the law requiring consideration of mitigating circumstances before deciding how to vote on the sentence. In effect, the jurors in those cases stated that they would vote for death because of the aggravating circumstances in the particular case and regardless of any mitigating evidence that may be presented. Thus, the jurors' views on capital punishment in the particular case prevented or substantially impaired them from following the law under the Louisiana's capital sentencing scheme.
Miller, 99-0912 at 12, 776 So.2d at 404 (emphasis supplied).
[21] In support of his claim that introduction of the evidence was presented merely to prove his bad character, defendant points to a portion of the state's closing argument in which the prosecutor stated:

And the reason we showed you the other crimes is because he did it over and over again. And it was always people confronting him, always getting caught while he was burglarizing, but every time he got caught he always had the upper hand.
[22] Although defendant does not challenge the admission of this evidence at the guilt phase on the grounds that these crimes were not proven by clear and convincing evidence, we note that in April of 2000, a jury convicted defendant and condemned him to die for the murder of Joan Brock. In addition, defendant was sentenced to life in prison in February 2001 after pleading guilty to killing Barbara Bourgeois. Defendant also pled guilty to the murders of Sam and Louella Arcuri and was sentenced to two life terms.
[23] On July 19, 1999, the state filed its formal notice of its intent to introduce evidence of the following crimes:

1. The first degree murder of Victor J. Rossi;
2. The armed robbery of Victor J. Rossi;
3. The theft of an automobile belonging to Victor J. Rossi;
4. The attempted first degree murder of Leonce J. Millet, Jr. and Joyce Millet;
5. The armed robbery of Joyce Millet and Leonce J. Millet, Jr.;
6. The aggravated burglary of Joyce Millet and Leonce J. Millet, Jr.;
7. The theft of an automobile belonging to Joyce Millet and Leonce J. Millet, Jr.;
8. The first degree murder of Barbara Bourgeois;
9. The aggravated burglary of Barbara Bourgeois;
10. The first degree murder of Mr. and Mrs. Sam Arcuri; and
11. The first degree murder of Mrs. Joan Brock.
[24] Notably over a month before the state filed its formal Prieur notice, defense counsel acknowledged that the state intended to introduce evidence of the other murders at the guilt phase at a hearing on defendant's motion for a continuance, held on June 10, 1999.
[25] In Martin, a forgery prosecution, this Court held that evidence that the defendant threatened the codefendant's life and unlawfully distributed drugs to her should not have been admitted to demonstrate that he aided or abetted in the forgery or counseled or procured codefendant to commit the crime, because knowledge and intent to prove the defendant was a principal to the offense were fully established by other, uncontradicted evidence.
[26] Under Chapman, an appellate court must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." Id., 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-11. The reviewing court must therefore be able to say that the jury's verdict in the particular case was surely unattributable to the error. Sullivan v. Louisiana, supra; State v. Sanders, 93-0001, p. 25 (La.11/30/94); 648 So.2d 1272, 1291.
[27] In his final claim relating to admission of the other crimes evidence, defendant argues that the court read a misleading limiting instruction when it charged the jury as follows:

. . . Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. You are advised of the limited purpose for which the evidence was received. (emphasis added).
Defendant maintains that proof of the other murders was not admissible to show motive, opportunity, preparation, plan, knowledge or identity and hence that jurors may have considered the evidence for a prohibited or irrelevant purpose.
As an initial matter, defendant did not object to the charge on the basis that it would allow jurors to consider the evidence for an impermissible purpose and thus waived the claim. La.C.Cr.P. art. 841; see State v. Sims, 426 So.2d 148, 155 (La.1983) (new basis for an objection may not be urged for the first time on appeal); State v. Stoltz, 358 So.2d 1249, 1250 (La.1978) (same); State v. Ferguson, 358 So.2d 1214, 1220 (La.1978) (same).
In any event, arguably, the court should have instructed the jury that it could only consider the other crimes evidence to prove intent, lack of accident or mistake. See Louisiana Judges' Criminal Bench Book § 5.04 (suggesting that the court instruct the jury that it may consider the crimes evidence for the "sole purpose" of whether it tends to show "purpose for which the court has admitted the evidence, e.g., to show guilty knowledge, absence of mistake or accident, intent, system, motive or identity."). However, in the state's closing, the prosecutor argued forcefully that the "limited purpose" of the crimes evidence was "to show either the intent of the [d]efendant, absence of a mistake on the part of the [d]efendant, or absence of an accident on the part of the [d]efendant." Given the entirely speculative nature of the claim concerning jurors possibly misinterpreting the instruction, this claim lacks merit.
[28] Ultimately, the state withdrew its intent to present evidence that defendant committed a felony theft and aggravated burglary upon Wayne Melancon.
[29] Officers Hymel, Toney and Breaux also participated in the interrogation.
[30] In particular, defendant points to the following excerpts from Sparks's interrogation:

. . . I been a law enforcement officer for nearly twenty years okay. I've got a lot of education, I'm a smartI'm a smart individual or II guess I think I'm smart, okay, I'm well read, okay got a lot of education[.] [W]ho do you think their [sic] gonna believe[?] I mean where does it point at, you understand what I'm saying?
* * *
. . . [Y]ou know I'm not stupid, the officers you talked to this afternoon aren't stupid, okay give us the benefit of the doubt. We're not doing this because we're stupid, okay. We're doing this because we've been trained for a job, we know what we're doing. The whole point being, okay. You go in front of a jury right now, present your side of the story, we present our side of the story, we got problems bubba, okay. Now on the other hand, on the other hand, we go to the jury and we say we don't have to present a story, Daniel told us what happened, whatever that story is you understand?
* * *
And then we go from there. Okay we don't have the problems that we're gonna have okay. You're sitting over there in your chair being silent, ain't saying nothing, got your hand crossed, looking mad, instead we go in front of the jury, front of the judge and we say this is what happened. Here's Daniel what Daniel said about this. Now you got to be honest with me that sounds a little bit better then [sic] sitting there doesn't it, like a lump, okay. Yeah, yes it does, okay. Something occurred, something occurred in your life, I don't know when, I don't know how it happened or why it happened or whatever. Okay you decided to take this to the next step, you didn't plan on hurting anybody, you didn't want to hurt anybody but you did okay. The only waythe only way to get this clarified is to tell us why this happened, why did you do this?
[31] In a somewhat exasperated response to Agent Sparks's insistence that defendant had committed the murder of Joan Brock, he told the officer:

Want to charge me for this, cause I don't know whatlook I'm tired, I been up, since 1:30 something this morning, ya'll drug me down here, ya'll been at it, I don't even know what time it is. Uh I'm thirsty, I got to use the bathroom, and you know all of this don't make no sense.
[32] Defendant asked Detectives Hymel and Toney about whether any consequences would result from his refusal to submit to the polygraph examination:

DB: What choice do I have?
TH: Well itit is your choice I mean.
MT: It's your choice.
DB: If I refuse then what?
TH: That's your prerogative I mean, this is something that we asked you before if you're responsible for committing these homicides and you stated no uh.
DB: I mean if I refuse it then what ya'll gonna do to me?
TH: Well I got to be honest with you if looking from an invesinvestigative stand point [sic], it doesn't look to [sic] good but I mean that's only my opinion, and I mean thatthat's.
DB: Well what I'm saying if Iif Iif I refuse the polygraph test what you gonna do, you gonna arrest me?
TH: You're not under arrest.
[33] Sparks described the state's evidence of the Brock murder to defendant as follows:

Okay the back yard of the victim's residence is surrounded by a six foot wooden privacy fence. In other words you couldn't see back there, the big wooden fence, six foot tall you and I couldn't even see over it, I'm not six foot either, well we couldn't even see over there. So who ever did this had to jump over the fence to get into the back yard okay. The person that did this gained access to the victim's residence through a set of French doors, located inin the back of the victim's residence that were left unlocked by the victim. It says a burglary or robbery appeared to be the motive for this incident. Now taking [sic] out of that house was a safe, okay. It was approximately 28 by 19 by 22. It weighed two hundred and forty-six pounds. It was taken out of aa walk in closet located in the victim's bedroom. This safe contained all kind [sic] of money, jewelry and other things. The residence uh in other words, nothing else taken from the residence the house, the residence was not rumished [sic] through, nothing else was known to be stolen out of it, the only [thing] that was taken out of here was the safe. It says that the person that did this dragged the safe into the garage area of the residence, loaded the victim's car and it's described as a 1991 Nissan Maxima and fled the scene. The victim's vehicle was later recovered abandoned and unlocked with keys in the ignition in the parking lot of a near by Holiday Inn Motel near [I]nterstate 10 and [I]nterstate 55 in LaPlace, Louisiana. The safe was not recovered, okay. You understand all that. So what this person didwhat this person did jumped the fence, attacked this woman, went into the residence, took the safe out of her bedroom, dragged it in the garage, put it into a 1991 Nissan Maxima, drove down the street to Interstate 10 and Interstate 55, next to a Holiday Inn, took the safe out and disappeared. And you had absolutely nothing to do with that?
[34] In Haynes, defense counsel objected to the prosecutor reading only excerpts of the defendant's incriminating statement and requested that it be read in its entirety. The trial court overruled the objection, effectively denying the defense the opportunity for the exculpatory parts to go before the jury as permitted under R.S. 15:450. Haynes, 291 So.2d at 772. In addition, the state's objection cut off any attempt by the defendant to explain the excerpts carefully culled by the prosecution from his statement. Id. Under those circumstances, this Court found that the state's deliberate attempts to use only portions, while denying the defendant the opportunity to introduce exculpatory portions of the statement or to explain any apparent inconsistencies with his trial testimony constituted a violation of R.S. 15:450 and constituted reversible error. Id. 291 So.2d at 773.
[35] In State v. Snedecor, this Court reiterated its holding in Haynes, supra, regarding the conflict between the rules precluding the admission of other crimes evidence and defendant's right to admit an inculpatory statement in its entirety as follows:

[A] party defendant is entitled to insist upon introduction of the entirety of a statement sought to be used against him, although of course he may waive the benefits of the protective statute. Thus, in keeping with the restrictions imposed in Sections 445 and 446, the trial court allowed introduction of only that portion of the statement dealing with the charged crime. Defendant, of course, could have required that the whole statement be introduced. This, however, is his choice to make. If he decides that the evidence of other crimes would outweigh the possible exculpatory value, then he may waive his right to have the whole statement introduced. The third alternative, that of keeping the whole statement out, is not available to defendant, unless, of course, the confession itself is not admissible. (Emphasis added).
[36] In the alternative, defense counsel suggested at trial that the videotape could be edited to delete all references to the polygraph examination and pictures of the polygraph machine, and that the jury would see only an FBI agent questioning defendant. The videotaped version of the Spark's interview and polygraph is not available in the record, so we have no view as to whether or not the suggestion of editing the polygraph machine out of the videotape was practical. However, as explained infra in the harmless error analysis, it is clear from the verbatim transcript of the Spark's interview that the vast majority of the interview, 25 pages of the 35-page transcript, consisted of Spark's explaining the polygraph process, going over the exact questions he would ask, and administering the polygraph. Thus, if defense counsel's suggestion was adopted, the jury would have only been left with 10 pages of transcript to consider, and even those pages contained references to the polygraph which would have to be deleted. Thus, it is arguable whether the trial court erred in failing to let the jury consider the Sparks' interview with all references to the polygraph and images of the polygraph machine edited out.
[37] In addition to the portions of the Sparks' interview quoted at page 17, n. 14, page 47, n. 30, and page 48, n. 33, the only other even marginally aggressive things Sparks said were as follows:

DS: All right now then, based upon the investigation that's conducted so far okay. Indications are you're involved in this thing. Now I don't know what you're involvement is looks like it's direct involvement thought. And I don'tnow hold on now, I want you to listen to me okay. II don't why based upon everything that's occurred up to this time, how a person like yourself would get involved in something like this but you have. Okay there's no two ifs and buts chances or whatever about it okay. Now it the time for you to decide where you gonna go with this okey, you understand that?
. . .
DS: . . . But I have no doubt based upon our investigation that is conducted and this investigation didn't start, remember I told you about the guy thatthat comes in, he didn't plan this today, he planned this yesterday, it's the same way with us. WE been doing this a long time, okay. We've been doing this investigation a long time, okay. Coup De Gras was taking that polygraph test okay. It's indicated to me okay, based upon whatwhat's occurred, what happened and everything else okay that you're involved in this, I don't know why. I can't explain it, I'd sit hereI'd nono I want you to listen tome. I'll sit here and try to reason with you, I told you to be truthful with me, we won't have any problems.
. . .
DS: You just saying that. Well you explain to me thenyou explain to me why we would spend all this time and all this effort in going after somebody okay, we're not stupid and we're not dumb, we're not very good looking either okay. How can you how can you sit there and look at me and tell me when you go home okay that you're child is not going to be upset with you, that your family is not going to be upset with you. The only way that you can come to a meeting of the mind and start feeling bettera little bit better about yourself, is get this off you mind okay. You family is still going to love you no matter what, they're going to still low you okay. I don't care what you say, they're still going to care for your, they still going to have concerns for you okay. As a matter of factas a matter of fact they'll probably going to be a little proud of you, at least you stood up and acted like a man okay.
DB: un-un.
DS: Instead of swarming down some little rat hole and trying to hide from it you faced it like a man.
. . .
DS: They are going to be disappointed in you okay, they're going to be hurt, they going to loose their father okay. But some day you'll be able to sit down with them and tell them say listen I did a bad thing, those kind of things happen in life, something happened to me 12-14 months ago I don't know what it was. I decided at that time I wanted to provide a little extra for ya'll, provide a little extra for me, I got scared, things happened, I didn't plan on this happening, I'm sorry for what I did, I'm going to pay the piper for what I did, but I have got to go on with my life and I want you as my child to understand what I did and what I did was wrong okay. You can't sit there and tell me this is not eating you up a little bit, I know it is okay.
DB: No what's bothering me isis.
DS: Okay.
DB: It looks like I'm being charged with something I don't know anything about.
DS: No.
DB: And
DS: Nono, hold on a minute, let melet ask.
DB: You know had nothing to do with.
DS: I'mI'm glad you said that okay.
DB: Okay.
DS: I'm glad you to told me that you think you're being charged.
DB: Well I mean the waythe waythe way.
DS: Let me tell you this right now. Have you been charged with anything?
DB: No.
DS: No, you haven't been charged with anything.
DB: That's what itit, you.
DS: That's what it appears to be?
DB: From what you're telling me you knowthe way you telling me that ya'll know.
DS: Okay, alright.
DB: Ya'll know.
DS: Well I want you to sit there and look look at the facts that have occurred okay, bear with thisbear with us. Okay you've already been told and this has beenthis is a joint investigation from 2 to 3 months, you think all those files and everything we have are just empty paper, no their not, their not okay [sic]. What did I tell you about what we do when we profile an individual. We look at an individual that can meet the profile that could of committed these crimes okay. No you were given an opportunity on that polygraph that you said no I'm not that type of person okay.
DB: Right.
DS: Alright. Now you fit the profile okay, you knew the people, you lived in the area, everything fits, descriptions that have been given so forth it all fits okay. Give you a prof-polygraph. I would be sitting here talking to you if you passed the polygraph. I wouldn't be sitting here talking to you if we had gone through this investigation and you weren't the person that we metmet the profile that we're looking for. Back to what I was telling you okay. Something occurred, something is bothering you okay. The only way we're going to get this is to get the truth out okay. . . .
This type of questioning falls far short of the type of coercion which would render a confession involuntary.
[38] 

Q. Okay, alright. For the purposes of taping um have you tell me what was your relationship ah with the Brock's, how did you know them. Um go ahead andand take if from, I believe you worked for them at some point, if you can tell me approximately when, ah at what point in your life and how long you worked for them?
A. I worked for him it was right at a year right at a little over a year and ah it was basically the same thing, we use to go to street rod shows and everything, I did a lot of work for him, ah you know we built a couple of street rods and what not, and basically when it was time to build mine it was nobody never had time to mess with it you know they promise you this, promise you that and don't do nothing.
Q. Yeah.
A. It was basically the same thing, so more or less ah a win loss situation, just more or less take advantage of you, you know I wasI was out of a job and I was I was in pretty bad shape, my little brother had back trouble and then he called me to go back to work for him and you know more or less suckered me into everything and then pretty much booted me out after this.
Q. You felt you were taken advantage of?
A. Pretty much.
[39] The UCSR and CSI both state that defendant has four brothers. However, one of defendant's brothers testified at the penalty phase that he and Daniel were among six sons born to their parents. Defendant's father also stated that he had eight children.
[40] In his confession, defendant admitted taking an envelope containing $120.00 from Mrs. Philippe's residence.